Steven **EDWARDS**, Appellant (Defendant Below),

v.

**STATE of Indiana**, Appellee (Plaintiff Below).

No. 49S00–0008–CR–476.

Supreme Court of Indiana.

Aug. 23, 2001.

Michael Gene Worden, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Janet L. Parsanko, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SHEPARD, Chief Justice.

Steven Edwards appeals his conviction for conspiracy to commit murder. He presents one issue: whether the evidence presented at trial was sufficient to sustain his conviction.

### Facts and Procedural History

The facts most favorable to the verdict reveal that on the evening of December 20, 1998, seventeen-year-old Chris Harris went to the home of his aunt Tracie Brooks to change a light bulb. Appellant Steven Edwards, with whom Harris was living, accompanied Harris. While there, Edwards received a call and rushed Harris to leave, saying, "We better go kill this man, get this over with." (R. at 592–93.) Edwards and Harris then returned to Edwards' residence on Oakland Avenue in Indianapolis.

At the Oakland residence, Edwards hurriedly gathered together latex gloves, a rag, and a jacket. Shortly thereafter, James Alred and an unidentified man pulled up outside the residence in a Ford Taurus. They honked the horn, Edwards joined them in the car, and the three drove away. Alred, the driver of the car, had previously dealt in cocaine with Matthew Grady, the victim of the crime at issue in this case.

Shortly after 9:20 that evening, Grady returned home from Christmas shopping and received a page from Alred. Grady responded by calling Alred's cell phone around 10 p.m. After telling his wife he would be "right back," Grady left in a blue and silver pick-up truck.

At 11:34 p.m., the Indianapolis Fire Department received a report of a fire at North White River Parkway, West Drive. Firefighters and police officers responding to the scene discovered Grady's body on fire. Police found a pager and driver's license (both partially melted) next to the body, and $93 in Grady's pocket. Grady's truck and cell phone were not recovered at the scene.

An autopsy revealed that Grady had been hit on the forehead, causing bleeding in the brain. He had also been hit on the neck with enough force to crush his larynx. Although the autopsy did not show with certainty whether Grady was burned while

alive or dead, burns covered more than 75 percent of his body. Grady died as a result of blunt force trauma to the head and neck and thermal injury from the fire.[1]

Edwards returned to the Oakland residence not long after the police came upon Grady's body, around 2 a.m. on December 21st. He asked Harris to get him a plastic bag and bleach. He entered the bathroom, and subsequently re-emerged, handing Harris the plastic bag and asking him to take it to the dumpster without looking inside. As Harris took the bag to the dumpster, he observed that the bag contained Edwards' clothes and smelled of bleach. He returned to the house and talked with Edwards for a while. During their conversation, Edwards said that he would soon receive money from Alred.

Later on the 21st, Edwards complained to Harris that Alred had not yet brought him the money. The next day, Alred and another man came to the Oakland residence and gave Edwards $3000. Edwards and Harris then made phone calls, drove around for a few hours, and purchased $2700 worth of cocaine. During this time, Edwards told Harris that Alred and the other man were "some killers." (R. at 622.) He said that they had "whooped" some guy and "burnt" him. (R. at 622–23.) He then threatened to kill Harris if he "ran his mouth." (R. at 627.)

Harris first talked to police about this case after his name appeared in a Crimestoppers advertisement following a newspaper article about the Grady murder. Harris' aunt took him to the police station. Harris did not want to talk, but after

learning that police had some information implicating him in the crime, he gave a statement. Edwards was later arrested and charged with murder, conspiracy to commit murder, and criminal confinement.

On the day Harris was to testify at trial, he told the prosecutor he was going to testify differently than he had previously testified under oath. He confirmed his intention to the trial judge, who advised Harris that he could be charged with perjury if his testimony differed from previous statements given under oath. Harris was then given an opportunity to speak with counsel in the presence of his grandmother.

Called later as a witness, Harris gave testimony consistent with his earlier statements. Edwards' attorney questioned Harris about his announced intention to testify differently, and Edwards admitted before the jury that he had considered changing his testimony.

The jury found Edwards guilty of conspiracy to commit murder, but acquitted him of murder and criminal confinement. Edwards then pled guilty to the habitual offender charge. The court sentenced Edwards to forty years for conspiracy to commit murder plus thirty years for being an habitual offender. Edwards now brings this case on direct appeal.

### Sufficiency of the Evidence

■ Edwards claims that Harris' testimony was coerced, equivocal, and uncorroborated, and therefore insufficient to sustain his conviction.[2] (Appellant's Br. at 9.)

---

1. During the autopsy a closed, but chainless, handcuff was discovered on each of Grady's wrists. A three-link chain was recovered near Grady's body at the scene.

2. Edwards further claims the entirety of the evidence against him is circumstantial and does not establish Edwards' guilt as a matter

of law. (Appellant's Br. at 9.) He concedes, as he must, however, that a conviction may be sustained solely upon circumstantial evidence. *Chambers v. State,* 526 N.E.2d 1176, 1178 (Ind.1988). Conspiracy to commit a felony requires an agreement to commit a felony and an overt act in furtherance of that

Although we will not reweigh the evidence or judge witness credibility on appeal, *Tillman v. State*, 642 N.E.2d 221, 223 (Ind.1994), Edwards asks us to re-evaluate Harris' testimony based upon the "incredible dubiosity rule." (Appellant's Rep. Br. at 1.) This rule is applicable only when a lone witness offers inherently contradictory testimony that is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of the appellant's guilt. *Tillman*, 642 N.E.2d at 223 (citing *Gaddis v. State*, 253 Ind. 73, 82, 251 N.E.2d 658, 663 (1969)). To interfere with the jury's authority to judge witness credibility and evaluate evidence, the court must be presented with testimony which "runs counter to human experience" and that reasonable persons could not believe. *Campbell v. State* 732 N.E.2d 197, 207 (Ind.Ct.App.2000).[3] It is a rare occasion.

Edwards claims Harris' aborted intention to change his testimony renders his statements equivocal and contradictory. He also maintains that reasonable persons could not believe Harris' testimony because he is untrustworthy and a "juvenile delinquent drug dealing admitted liar." (Appellant's Br. at 1.) As such, Edwards says it is inconceivable Edwards would confide in him about participation in any crime.

The "incredible dubiosity" test is a difficult standard to meet, one that requires great ambiguity and inconsistency in the evidence. However, it is not impossible. In *Sisson v. State*, 710 N.E.2d 203 (Ind.Ct. App.1999), the key witness testified on direct examination that the defendant was involved in three burglaries, then recanted during cross-examination and stated that the defendant was only present during the first burglary. *Id.* at 205, 208. The witness also admitted during cross-examination that he had lied to police and to the jury. *Id.* at 206. His testimony was also rife with equivocal language, and he was inconsistent about which houses the defendant had helped burglarize.[4] *Id.* The jury acquitted the appellant of two burglaries, but convicted him of burglarizing one house about which the witness was particularly unclear. *Id.* at 207. The Court of Appeals held that such blatantly contradictory testimony could not support the jury's verdict. *Id.* at 207–08.

*Sisson* demonstrates the sort of prevarication and contradiction necessary to merit reversal based on the "incredible dubiosity" rule. The testimony must be so convoluted and/or contrary to human experience that no reasonable person could believe it. *Campbell*, 732 N.E.2d at 207.

Harris' testimony does not meet that standard. Unlike the witness in *Sisson*, Harris was not inconsistent throughout his testimony. His statements before the jury at trial were in accord with those given previously under oath. And though Harris did consider changing his testimony

---

agreement. Ind.Code Ann. § 35–41–5–2 (West Supp.1999). The State contends, and we agree, that an agreement between Edwards and Alred can be inferred from the evidence presented at trial, and that Edwards leaving in the car driven by Alred the night of the murder constituted an overt act in furtherance of the agreement. (Appellee's Br. at 10.)

**3.** In *Gaddis*, for example, the witness vacillated between certainty and uncertainty when identifying the criminal and no other evidence was presented linking the defendant to the crime. 253 Ind. at 79, 251 N.E.2d at 661. The court found such equivocal testimony was insufficient, on its own, to support the conviction. 253 Ind. at 81, 251 N.E.2d at 662.

**4.** For example: "Q: Did [Sisson] enter the [Marcellino] residence with you? A: ... I was sure he was in there, but I can't be sure ... I don't know ... but I don't know—I was sure it was him, but." *Id.*

during the trial, the jury was made aware of this fact during cross-examination. As Harris' proposed alteration of his testimony was put squarely before the jury, the jury had the ability to perform its role as a trier of fact and determine the extent to which it affected the integrity of his testimony. *See Albrecht v. State,* 737 N.E.2d 719, 733 (Ind.2000). Harris testified on redirect that he attempted to change his story because he was scared. The jury would not be unreasonable in accepting this (or another) plausible explanation.

■ Edwards complains that Harris' testimony was inconsistent with other evidence presented (as to the color of Alred's vehicle, and whether or not he was awakened by Linda Phillips at 2 a.m. December 21, 1998). (Appellant's Br. at 16.) Harris testified that the Ford Taurus driven by Alred the night of the murder was gray. Rental company records indicated the Taurus rented by Alred was "light prairie tan." (R. at 406, 408.) It is the jury's duty to resolve variations in testimony. It was not, as a matter of law, inappropriate for the jury to accept Harris' testimony on the essential elements for conspiracy, despite a modest discrepancy on the color of Alred's car.

Edwards asserts that Harris lied when stating that Phillips woke him at 2 a.m., because Phillips testified she was on medication and "out of it" and did not speak to anyone. The jury could have resolved this alleged inconsistency without finding Harris unbelievable. Phillips' own testimony indicates she was unclear about the events of the early morning hours of December 21st. Whether or not Phillips awakened Harris is a matter of fact for the jury to determine and weigh. It is not an issue that demands that the jury discredit Harris' testimony.

Edwards also asserts that Harris' testimony is unbelievable because "only a complete moron would divulge such incriminating information to a punk kid like Chris." (Appellant's Br. at 17.) To reverse under the "incredible dubiosity" rule, the court must find that the testimony "runs counter to human experience" and that "no reasonable person could believe" it. *Campbell,* 732 N.E.2d at 207. It is neither counter to human experiences nor unreasonable that Edwards would confide in a person with whom he lived, whom he called his "right hand man," (R. at 627), and with whom he shared family (Edwards was the brother of Harris' guardian and aunt-by-marriage, Stacey Harris).

■ Edwards further contends that the police and Harris' aunt, Tracie Brooks, coerced Harris' statements. Harris testified that he did not want to talk to the police, but that everyone in his house and neighborhood told him he should talk after his name appeared in the paper. Harris also said his aunt threatened to turn him in to the police if he did not testify. Edwards claims that since Brooks was not Harris' legal guardian, and since Brooks may have received money from Crimestoppers for facilitating Harris' statement, Brooks coerced him into giving a statement to police for her own benefit. There is no actual evidence, however, that Brooks attempted to influence the content of Harris' statement. Though Harris' initial meeting with police occurred at Brooks' urging, her involvement does not compromise Harris' testimony.

■ Harris testified that during his initial meeting with police he was told he could be charged in the crime if he did not cooperate. He also stated that the police threatened to go to his neighborhood and say he was giving them the names of those to whom he had sold drugs. Harris said he was scared by these threats and decided to give a statement. Detective Scheffel testified at trial that he and Sergeant Heffner told Harris they thought they had enough information to implicate him in the

crime, but could neither confirm nor deny that Heffner had threatened to tell Harris' neighbors he was talking to police about his drug dealings. The members of the jury heard this testimony and were aware of the circumstances surrounding Harris' statement.

In *Albrecht,* 737 N.E.2d at 733, the court held that the testimony of a witness who had initially provided an alibi for the defendant, but changed his story after police threatened him with prosecution and incarceration, could still have been found credible by the jury. As in this case, the circumstances of the witness's testimony in *Albrecht* were put before the jury, and the court determined that "[t]he extent to which threats may have, in some degree, affected a third party's testimony goes to the weight to be given the testimony by the trier of fact." *Id.*

Harris stated consistently throughout his testimony that Edwards left in a car driven by Alred, that he returned in the early morning of December 21, 1998, and asked Harris to dispose of clothes for him, and that Edwards had received $3000 from Alred. Harris' testimony was not incredibly dubious, and the jury's estimation of Harris' credibility is not improper as a matter of law. The jury heard evidence that Harris had been unwilling to talk to police and that detectives had encouraged him to give a statement by informing him of the possible consequences of not talking to police. An informed jury did not have to equate Harris' reluctance with deceit. There is no need to re-evaluate the jury's determination of witness credibility.

■ Edwards also contends that a phone call made to Alred's phone from the Oakland residence at 11:27 on the evening of the murder helps discredit Harris' testimony and the jury verdict. Edwards claims that since both Phillips and Harris claimed not to know Alred's cell phone number, Edwards must have made this call. He contends that this not only proves that Harris lied about the time of Edwards' return, but also definitively removes Edwards from the crime scene.

While it could be inferred that Edwards made the call, however, it is not an established fact that the jury must believe. Furthermore, Edwards was convicted of conspiracy to commit murder, and the State needed to prove only the existence of an agreement to commit murder and an overt act in furtherance of the crime. Ind. Code Ann. § 35–41–5–2 (West Supp.1999). Whether or not Edwards placed the phone call at 11:27 p.m. has no bearing on his prior statement about going to "kill this man," (R. at 593), or upon his leaving with Alred earlier in the evening.

■ Finally, we note that Harris' testimony is not the only evidence supporting the verdict. The State offered testimony to establish that Grady and Alred had dealt together in cocaine, presented phone records indicating telephone calls and pages between Alred and Grady and Edwards the night of the murder, and showed that a pair of handcuffs was found on Grady's body, while testimony indicated that a pair was missing from Edwards' residence. (*See* Appellee's Br. at 12.) This constituted a fair amount of circumstantial evidence of conspiracy to commit murder. With Harris' testimony, there was enough evidence to conclude beyond a reasonable doubt that Edwards conspired with Alred to commit murder.

### Conclusion

We affirm the judgment of the trial court.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.