

**FILED**

Sep 17 2015, 8:54 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Michael R. Fisher
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tywaun Carter, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | September 17, 2015 <br><br> Court of Appeals Case No. <br> 49A04-1502-CR-52 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Mark Stoner, Judge <br><br> Trial Court Cause No. <br> 49G06-1410-F1-47999 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a bench trial, Tywaun Carter was convicted of two counts of Level 1 felony rape. The trial court sentenced Carter to thirty-two years on each count, to be served concurrently in the Indiana Department of Correction. Carter appeals his convictions and sentence, raising two issues for our review: (1)

whether the evidence presented at trial was sufficient to support his convictions; and (2) whether his sentence was inappropriate in light of the nature of the offenses and his character. Concluding the State presented sufficient evidence and Carter's sentence is not inappropriate, we affirm.

## Facts and Procedural History

On the afternoon of July 16, 2014, A.M. was visiting friends in the vicinity of 10th Street and Rural Street in Indianapolis. She had been working as a prostitute in the area for approximately two months.

A.M. was walking westbound on North Street when Carter approached her. Carter introduced himself as "Tyrell" and said, "Hey, girl. You know, what's up with you? Come talk to me." Transcript at 9. A.M. did not know Carter and had never seen him before. She told Carter she was "just trying to make some money or hang out." *Id.* Carter replied he "lived close" but "didn't have a lot of cash" so they would have to "work something out." *Id.* A.M. "took that to mean . . . that he wanted to exchange money for sexual services." *Id.*

Carter and A.M. walked two blocks north to a house located at 917 North Rural Street. They entered through the front door, which was unlocked, and proceeded upstairs to a bedroom. Other than a mattress on the bedroom floor, the house was empty and appeared abandoned. Carter said he was going to get a marijuana "blunt" and briefly stepped out of the room. *Id.* at 12. When Carter returned, he told A.M. he "didn't have any weed" and "didn't have any

money either" but was "going to get some pussy one way or the other." *Id.* at 12-13. A.M. told Carter she "didn't want to do that," and said, "No. No. It doesn't work like that." *Id.* at 13. Carter reiterated he was "going to get it one way or the other." *Id.*

When A.M. realized that Carter was not going to let her leave, she attempted to escape through an open window in the bedroom. Carter grabbed A.M.'s shoulder and pulled her back inside. Carter warned, "Don't do that. You know how this is. . . . You know what's going to happen." *Id.* at 14. A.M. tried to run towards the bedroom door, but Carter grabbed A.M.'s hair before she reached the door, causing her to fall to the floor. He picked her up and threw her face down on the mattress, at which time A.M. again said, "I don't want to do this." *Id.* at 18. A.M. continued to physically resist as Carter tried to pull off her shorts. She stopped resisting when she felt a gun press into her back.

Carter penetrated A.M.'s vagina with his penis and forced A.M. to perform oral sex on him while he pointed the gun at her head. Carter told A.M. she would not get hurt as long as she cooperated. A.M. testified:

> He kept telling me that I had a really nice ass and . . . that he was going to get a piece of that ass and that he was going to do this several times. He wasn't going to let me leave, keep me all night . . . . I was asking him, please not to do that, that I was being cooperative and that please not to do that . . . .

*Id.* at 21-22.  As soon as Carter ejaculated, A.M. asked if she could use the bathroom.  Carter waved the gun towards the bathroom and said, "Don't try anything stupid."  *Id.* at 23.

[7]    A.M. pulled her shorts on and ran out of the bedroom, down the stairs, and through the front door.  It was still daylight when A.M. emerged from the house.  She immediately ran to a friend's house where she had been staying.  When A.M. realized no one was home, she continued to another friend's house.  At the second house, she encountered a group of women on the porch who also worked as prostitutes in the neighborhood.  The women saw that A.M. was upset and asked her what had happened.  When A.M. disclosed the assault, the women insisted she call the police.

[8]    A.M. walked to a nearby liquor store to use a pay phone.  The first call she made was to her friend David Betzner.  After hearing what had happened, Betzner urged A.M. to call the police and said he was on his way.  Betzner testified that A.M. was crying and sounded "very stressed" during the call.  *Id.* at 88.

[9]    A.M. called 911 at 8:21 PM and reported the assault.  She was crying and stayed on the line with the operator until the police arrived.  Officer Aaron Helton of the Indianapolis Metropolitan Police Department ("IMPD") was the responding officer.  When Officer Helton arrived, A.M. was "hysterical."  *Id.* at 98.  She was crying, red in the face, and unable to provide details about the assault.  Betzner and Detective David Miller arrived shortly after Officer

Helton. When Detective Miller spoke with A.M., she was "very upset, crying, shaking," but she was able to tell him where the assault had occurred and give a description of the suspect. *Id.* at 109. She most vividly remembered Carter's tattoos: flames on both forearms, the name "Otisha" above one of the flames, and the number four on one of his hands. *Id.* at 110.

[10] After A.M. spoke with Detective Miller, Betzner drove her to the hospital for a sexual assault exam. The forensic nurse examiner described A.M. as "tearful, anxious, and disheveled" upon arrival. *Id.* at 138. A.M. exhibited an abrasion on her left wrist, extreme tenderness to the back of her head, lower back pain, and vaginal tenderness that made it difficult for the nurse to conduct the exam. The exam did not reveal any vaginal abrasions, but the nurse testified that the absence of vaginal abrasions is very common. The nurse found nothing inconsistent with A.M.'s account of the assault and recovered seminal fluid from A.M.'s vagina and clothing.

[11] Based on A.M.'s description of her assailant's tattoos, Detective Miller identified Carter as a possible suspect. Detective Miller generated a photo array containing Carter's picture, but A.M. was unable to identify Carter or any other individual in the photo array. Nonetheless, Detective Miller obtained a search warrant to collect a buccal swab from Carter for the purpose of DNA comparison. When Carter was apprehended for the buccal swab on October 2, 2014, he agreed to speak with Detective Miller about the incident. Carter initially denied having sex with A.M. He admitted to having sex with her once Detective Miller told him that semen had been recovered, but he maintained

the sex was consensual and denied having a gun. Carter told Detective Miller they "had stupid great sex" and "she loved it." State's Exhibit 8A at 20. Carter claimed he "talked her into it," and bragged that he "know[s] how to game a prostitute outta some pussy" because he "look[s] good as fuck." *Id.* at 21. He told Detective Miller that A.M. "was just a fuck bag." *Id.* at 29. Forensic testing later revealed that the DNA from the semen recovered from A.M.'s vagina and clothes matched Carter's DNA.

[12] On October 17, 2014, the State charged Carter with six felonies: Count I, Level 1 felony rape; Count II, Level 1 felony rape; Count III, Level 1 felony rape; Count IV, Level 1 felony rape; Count V, Level 3 felony criminal confinement; and Count VI, Level 3 felony kidnapping.[1] A bench trial was held on December 22, 2014, at which time the trial court reduced the kidnapping charge to a Level 6 felony. At the conclusion of the trial, the trial court found Carter guilty on all counts. At sentencing, the trial court merged Carter's convictions under Counts III, IV, V, and VI with his convictions under Counts I and II. The trial court sentenced Carter to thirty-two years on each remaining count, to be served concurrently in the Department of Correction. Carter now appeals his convictions and sentence.

---

[1] The rape charges were elevated to Level 1 felonies because Carter committed the offenses while armed with a deadly weapon. *See* Ind. Code § 35-42-4-1(b)(2).

# Discussion and Decision

## I. Sufficiency of the Evidence

Carter contends the State presented insufficient evidence to support his convictions for rape because A.M.'s testimony was uncorroborated and so inherently improbable and equivocal that the incredible dubiosity rule should be applied.

### A. Standard of Review

When reviewing the sufficiency of evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). "It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction." *Id.* Accordingly, we generally do not judge the credibility of witnesses, and when confronted with conflicting evidence, we consider it most favorably to the trial court's ruling. *Id.* The conviction will be affirmed unless no reasonable fact-finder could find the elements of the offense proven beyond a reasonable doubt. *Id.*

### B. Incredible Dubiosity of A.M.'s Testimony

The incredible dubiosity rule allows an appellate court to impinge upon the fact-finder's assessment of witness credibility when the testimony at trial was so "unbelievable, incredible, or improbable that no reasonable person could ever

reach a guilty verdict based upon that evidence alone." *Moore v. State*, 27 N.E.3d 749, 751 (Ind. 2015). Incredible dubiosity is a difficult standard to meet, requiring ambiguous, inconsistent testimony that "runs counter to human experience." *Edwards v. State*, 753 N.E.2d 618, 622 (Ind. 2001) (citation omitted). Our supreme court recently reiterated the limited scope of the incredible dubiosity rule, setting out three requirements for its application: (1) a sole testifying witness; (2) testimony that is inherently contradictory, equivocal, or the result of coercion; and (3) a complete absence of circumstantial evidence. *Moore*, 27 N.E.3d at 756.

[16] Carter admits he had sexual intercourse with A.M. but denies that A.M. was compelled by force. *See* Ind. Code § 35-42-4-1(a)(1). He invokes the incredible dubiosity rule, arguing A.M.'s testimony is incredibly dubious and the only evidence of force. In support of his argument, Carter makes much of the fact that A.M. did not tell Officer Helton or the forensic nurse examiner that she had been engaging in prostitution. He argues A.M.'s inconsistent statements regarding how many sexual partners she had in the ninety-six hours preceding the rape "suggests her testimony was not based upon any specific recollection, but rather reflects a willingness to bend the truth as she found convenient." Br. of Appellant at 9. Carter also points to the fact that A.M. did not tell Detective Miller she had tried to escape through a window. He notes A.M. was inconsistent regarding the time she smoked marijuana that day and the time at which she was able to escape and call for help. Finally, Carter equates the

absence of vaginal abrasions with a complete lack of circumstantial evidence that a rape occurred.

[17]   We first note that A.M.'s initial failure to disclose she had been working as a prostitute is not the same as denying she had done so. A.M., by her own admission, was engaging in illegal activity, and in deciding whether to report the assault to the police, she "was afraid that [she] would be in trouble as well." Tr. at 65. As to the forensic nurse examiner, the purpose of a sexual assault exam is to "ascertain a medical diagnosis for treatment," not investigate a crime or interrogate the victim. *Id.* at 165. A.M. spoke with Officer Helton and the forensic nurse examiner immediately after the assault, when she was upset and likely afraid her disclosure would not be taken seriously.[2] We believe A.M.'s omission in the wake of this traumatic event is not particularly incredible and does not constitute an inconsistency in the first place.

---

[2] Carter contends he "did nothing more with A.M. than what she was attempting to contract to do for money," as if his actions amount to a theft of services. Br. of Appellant at 8. In *Commonwealth v. Harris*, 825 N.E.2d 58, 75 (Mass. 2005) (Marshall, C.J., concurring in part and dissenting in part), then Chief Justice Margaret Marshall of the Massachusetts Supreme Court reflected upon "the difficulty of obtaining convictions in rape cases because of court room prejudice against alleged rape victims," particularly in cases in which the victim has engaged in prostitution:

> Prejudice or disbelief occurs with particular intensity when the complainant is a prostitute . . . . Prostitutes are frequent victims of rape. See, e.g., Anderson, From Chastity Requirement to Sexuality License: Sexual Consent and a New Rape Shield Law, 70 Geo. Wash. L.Rev. 51, 113 & n. 367 (2002) (citing studies substantiating that more than seventy per cent of prostitutes are victims of rape). Yet societal beliefs persist that prostitutes cannot be raped, or that they are not harmed by rape, or that they somehow deserve to be raped.

*Id.* at 75-76 (citations omitted). To the extent that Carter relies on these archaic cultural attitudes, such arguments have no place in our analysis. A.M.'s involvement in prostitution, in and of itself, does not render her testimony incredibly dubious.

[18] When asked why she initially failed to mention her attempted escape through a window, A.M. testified this particular detail seemed unimportant. Carter contends "[t]his was an important fact because it was purportedly the source of the scratch on her wrist, her only visible injury." Br. of Appellant at 9-10. A.M. at no point offered a different explanation for the scratch, and her judgment that this detail was not especially important is not unbelievable. Carter forced A.M., at gun point, to have sexual intercourse and perform oral sex. He held the gun to her temple while forcing her to perform oral sex and said he would "blow her head off" if she bit him. Tr. at 19. In the context of this violent ordeal, A.M.'s initial failure to mention the cause of a small scratch on her wrist is neither incredible nor "counter to human experience." *Edward*, 753 N.E.2d at 622.

[19] The actual inconsistencies Carter has identified do not concern the assault itself, and all were addressed at trial in front of the fact-finder. The exact time A.M. smoked marijuana on July 16, 2014, is an entirely collateral matter. Likewise, the number of A.M.'s sexual partners in the ninety-six hours preceding the rape is not probative of Carter's guilt. As to the exact time A.M. was able to escape Carter, A.M. estimated she met Carter on the street around 3:00 or 3:30 PM and fled the house around 5:00 or 5:30 PM. She further testified she made the 911 call less than an hour after escaping. In fact, the 911 call was made at 8:21 PM, and defense counsel impeached A.M. on this point during cross-examination. A.M. testified she was not entirely sure about the time because

she did not have a cell phone and was not wearing a watch that day. The judge followed up on this inconsistency:

> [Court:] What seems more likely to you, that you were wrong at the time of the encounter or you were wrong on how long it took?
> [A.M.:] Wrong at the time of the encounter. I think it was later in the day than it was.
> [Court:] Okay. Does it seem likely to you at all that if the call was made at 8:11 [sic] that you would have been with him for four hours?
> [A.M.:] That seems like . . . a really long . . . I don't feel like it was four hours. No.

Tr. at 84. This inconsistency was put squarely before the fact-finder, and the judge made a credibility call. The judge determined the extent to which the inconsistency affected the integrity of A.M.'s testimony. *See Edwards*, 753 N.E.2d at 623. Because A.M. being mistaken about the time by a couple of hours is not so "unbelievable, incredible, or improbable" that no reasonable person could believe it, we have no reason to second guess the trial court's determination. *Moore*, 27 N.E.3d at 751.

[20] Finally, contrary to Carter's assertion, A.M.'s testimony is corroborated by circumstantial evidence. Carter's semen was recovered from A.M.'s vagina and clothes, and A.M. exhibited extreme tenderness to the back of her head, lower back pain, and vaginal tenderness. Carter admits to having sexual contact with A.M. and even bragged that he "know[s] how to game a prostitute outta some pussy." State's Ex. 8A at 21. In addition, Officer Helton, Detective Miller,

Betzner, and the forensic nurse examiner consistently testified A.M. was visibly upset after the assault. A.M. is crying on the recording of the 911 call admitted into evidence,[3] and Officer Helton testified she was "hysterical" when he arrived. Tr. at 98.

[21] On the whole, the evidence is sufficient to support Carter's convictions for rape. A rape conviction may rest solely on the uncorroborated testimony of the victim, *Potter v. State*, 684 N.E.2d 1127, 1136 (Ind. 1997), and we do not consider A.M.'s testimony so "unbelievable, incredible, or improbable" that no reasonable person could believe it, *Moore*, 27 N.E.3d at 751. In the absence of incredibly dubious testimony, we will not impinge on the fact-finder's responsibility to judge witness credibility.

## II. Inappropriate Sentence

### A. Appellate Rule 7(B)

[22] Carter also contends his sentence is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) provides: "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The defendant bears the burden of persuading this court that his or her sentence is

---

[3] At sentencing, the trial court noted "specifically within the 911 call the terror and emotion, psychological damage displayed by the victim." Tr. at 256-57.

inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Whether we regard a sentence as inappropriate turns on "the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008).

## B. Carter's Sentence

[23] As to the nature of the offense, the advisory sentence is the starting point that the legislature has selected as an appropriate sentence for the crime committed. *Childress*, 848 N.E.2d at 1081. Carter was convicted of two counts of Level 1 felony rape. Pursuant to Indiana Code section 35-50-2-4(b), a person who commits a Level 1 felony "shall be imprisoned for a fixed term of between twenty (20) and forty (40) years, with the advisory sentence being thirty (30) years." Here, the trial court sentenced Carter to thirty-two years on each count, to be served concurrently in the Department of Correction.

[24] Carter's only argument regarding the nature of the offenses concerns the character of the victim. Carter contends that he is less culpable because A.M. was engaging in prostitution and is therefore not a "typical victim" of rape. Br. of Appellant at 15. First, we seriously question whether there is such a thing as a "typical victim" of rape. *See, e.g.*, Torrey M. Ford et al., *Perceptions of Rape Based on Sex and Sexual Orientation of Victim*, 13 J. Soc. Behav. & Personality 253, 253 (1998) ("Reactions to rape are largely based on stereotypes of rape

such as stereotypes about who the typical rape victim is and stereotypes blaming the victim.").

[25] Second, we note that women who engage in prostitution are *more* likely to be raped than non-prostituted women. Tr. at 196 (testimony of IMPD Sex Crimes Detective David Miller); *see also, e.g.*, Martin A. Monto et al., *Predictors of Rape Myth Acceptance Among Male Clients of Female Street Prostitutes*, 7 Violence Against Women 275, 275-78 (2001) (stating that approximately seventy percent of prostitutes are victims of rape and discussing the prejudicial stereotypes about rape victims "that serve to justify or support sexual violence against women").

[26] Third, we believe the relevant inquiry concerns Carter's own actions. A.M. repeatedly told Carter she did not want to have sex with him, but Carter did not stop. She physically resisted until Carter threatened her with a gun. Although A.M. had no serious physical injuries, this was "probably because of the use of the weapon." Tr. at 252 (Sentencing Order). A.M. was afraid that Carter would shoot her if she continued to resist, so she chose to submit rather than risk further injury. Carter has shown no remorse and has never taken responsibility for his actions. As the trial court noted at sentencing, Carter's description of "this incident not as being a violent offense or a violation of the victim's body, but a period of prolonged great sex" is a reflection of Carter's "narcissism." *Id.* at 256.

[27] As to his character, Carter contends his sentence should be reduced because he is "an immature twenty-year-old and is the product of a childhood so

horrendous that contact with the criminal justice system was inevitable." Br. of Appellant at 15. Carter was placed in foster care when he was five years old and was physically and sexually abused by various foster families as well as his adoptive parents. Carter's first arrest occurred at age nine, and he has significant criminal history as a juvenile and as an adult. The trial court found that most of Carter's past offenses were "minor" but demonstrated a pattern of "disrespect for human beings in terms of their space and not touching them." Tr. at 256 (citing Carter's convictions for resisting law enforcement, battery, and battery by bodily waste). In fact, at the time of the instant offense, Carter had just completed a sentence at the Marion County Jail for battery by bodily waste.[4]

[28] Carter undoubtedly had a "horrendous" childhood, but we disagree that his subsequent criminal activity was "inevitable." *See* Br. of Appellant at 15. Carter chose to rape A.M., and he has failed to take responsibility for his actions. Our supreme court "has consistently held that evidence of a difficult childhood warrants little, if any mitigating weight," *Ritchie v. State*, 875 N.E.2d 706, 725 (Ind. 2007), and the fact that A.M. had been engaging in prostitution does not excuse Carter's violent behavior. Given the nature of his offenses, his

---

[4] On July 10, 2014, Carter was convicted of battery by bodily waste, a Class D felony, under Cause Number 49F25-1401-FD-000201. He was sentenced to 180 days in the Department of Correction with eighty-five days of credit for time served. Carter served the remainder of the sentence in the Marion County Jail and was released on July 15, 2014, the evening before he raped A.M.

character, and his complete lack of remorse, we are not persuaded Carter's sentence of thirty-two years in the Department of Correction is inappropriate.

# Conclusion

[29] The evidence presented at trial was sufficient to support Carter's convictions for Level 1 felony rape, and we are not persuaded Carter's sentence is inappropriate. Carter's convictions and sentence are therefore affirmed.

[30] Affirmed.

Vaidik, C.J., and Pyle, J., concur.