## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 14 2020, 8:32 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tina L. Mann
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Travis M. Luedeman,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

December 14, 2020

Court of Appeals Case No.
20A-CR-769

Appeal from the Jackson Circuit Court

The Honorable Richard W. Poynter, Judge

Trial Court Cause No.
36C01-1907-F2-9

**Friedlander, Senior Judge.**

[1] Travis M. Luedeman was convicted of numerous felonies and misdemeanors after engaging in a multi-day crime spree in Jackson County. He appeals his

convictions of two counts of burglary, both Level 2 felonies;[1] two counts of robbery, both Level 3 felonies;[2] two counts of intimidation, both Level 5 felonies;[3] impersonation of a public servant, a Level 6 felony;[4] auto theft, a Level 6 felony;[5] theft with a prior conviction, a Level 6 felony;[6] two counts of pointing a firearm, both Class A misdemeanors;[7] and a determination that he is an habitual offender.  Luedeman also appeals the forty-year sentence imposed by the trial court.  We affirm.

Scott Caudell owns J & A Auto Electric, which is located in Jackson County and repairs and sells vehicles.  On June 19, 2019, a man entered the shop and asked to test-drive a blue Cadillac sport utility vehicle owned by J & A.  Caudell refused because he was busy.  Next, the man asked to look inside the vehicle, and Caudell gave him the key.  He got into the Cadillac and drove off.  Caudell reported the vehicle theft to the police.

The Fox family, including brothers Jerry Fox (seventy years old) and Larry Fox (seventy-one years old), owns several properties in rural Jackson County.  Jerry

---

[1] Ind. Code § 35-43-2-1 (2014).

[2] Ind. Code § 35-42-5-1 (2017).

[3] Ind. Code § 35-45-2-1 (2019).

[4] Ind. Code § 35-44.1-2-6 (2016).

[5] Ind. Code § 35-43-4-2 (2019).

[6] Ind. Code § 35-43-4-2.

[7] Ind. Code § 35-47-4-3 (2014).

parked a semi-trailer on one of their properties, next to an old, unsecured shed. He occasionally camped in the trailer and, when he was not using it, secured the doors with a padlock. Jerry stopped by the property every day before or after visiting his elderly parents, who lived down the road. A "No Trespassing" sign was posted at the entrance to the property's driveway.

[4] On the morning of July 1, 2019, Jerry discovered some items were missing from the shed. Specifically, someone had taken his fishing poles, a tackle box, and a propane torch. The tackle box contained over $500 worth of fishing gear. Those items had been in the shed when Jerry had stopped by the previous day.

[5] Jerry's son had set up a trail camera on the property, and Jerry asked him to check it later in the day on July 1. The camera's photographs showed a blue Cadillac sport utility vehicle driving on the property in the early morning hours of July 1. After Jerry and his son reviewed the photographs, Jerry's son set up a second trail camera at a different location on the property. Jerry did not contact the police about the incident.

[6] Jerry returned to the property on July 4, before sunrise. He turned onto the driveway, where he saw the headlights of a vehicle driving toward him from the direction of the shed and semi-trailer. As the other vehicle approached, Jerry recognized it as the Cadillac he had seen on the trail camera pictures.

[7] The two vehicles came to a stop about a foot apart, facing each other. Jerry got out of his truck, and a man later identified as Luedeman got out of the Cadillac. They stood twelve to fourteen feet apart, illuminated by the vehicles' headlights.

Luedeman wore a khaki uniform and a cowboy hat, with a badge on his chest and a handgun hanging from his belt. Jerry thought Luedeman resembled a sheriff's deputy, except that he had large piercings in his earlobes.

[8] Luedeman claimed to be "[a]n officer of the law." Tr. Vol. 2, p. 165. He also said he had chased people onto the property. Jerry accused him of lying. Luedeman denied Jerry's accusation and repeated that he was a police officer who had chased suspects onto the property. Jerry again called Luedeman a liar, and Luedeman said the landowner had asked him to check out the property. Jerry called Luedeman a liar a third time.

[9] At that point, Luedeman drew his handgun, pointed it at Jerry, and threatened to shoot him while repeating his claim that he was a police officer. Jerry stepped back, and Luedeman reentered the Cadillac. He drove around Jerry's truck, crushing several rows of cornstalks in the process, and left the property.

[10] Jerry called his brother Larry, who quickly drove to the scene. Larry saw a spot along the driveway where several rows of corn had been driven over. Jerry told Larry about the incident, as well as the incident on July 1. When Jerry and Larry went to the semi-trailer, they saw that the lock had been cut off of the doors. Jerry examined the interior of the trailer and determined over the course of several subsequent visits that a propane torch, two coolers, a Sawzall, a hand pump, bolt cutters, and a set of Tasco binoculars were missing.

[11] Meanwhile, Jerry's son Jay arrived, and he downloaded photographs taken by the trail cameras. The photos showed Luedeman's Cadillac entering the

property at 4:07 a.m. and leaving the property at 4:52 a.m., just as Jerry drove up. Jerry and Larry reviewed the photos.

[12] Down the road from Jerry's property was a house that had belonged to Roseanne George ("the George property"). After her death, the house sat vacant but still contained items that belonged to George. On the morning of July 5, 2019, before sunrise, Larry drove by the George property. The Cadillac that he had seen in the trail camera photographs was sitting in the driveway. Larry attempted to call 911 but was not able to connect.

[13] Next, Larry drove onto the George property and parked five to six feet behind the Cadillac. Larry got out of his car, intending to photograph the Cadillac's license plate. At that point, a man, later identified as Luedeman, walked around the side of the Cadillac, approaching from the direction of George's house.

[14] Luedeman was shirtless and had numerous tattoos on his arms and chest, as well as a "very large hole in his ear" on the right side. *Id.* at 247. He seemed to be "all strung out," with glassy eyes. Tr. Vol. 3, p. 4. His appearance matched Jerry's description of the person he had encountered on July 4. Luedeman was carrying a large cardboard box.

[15] Larry asked Luedeman what he was doing, and he claimed George's family had authorized him to take some items from the home. Luedeman refused to tell Larry his name. He put the box in the rear of the Cadillac, never entirely turning his back on Larry.

[16]     Larry called Luedeman a liar, informed him that he had called 911, and stated that Luedeman needed to stay until the police arrived. Next, Luedeman drew a handgun and pointed it at Larry's face. Larry backed away. Luedeman closed the back hatch of the Cadillac, entered the vehicle, and drove around Larry's car and off the George property.

[17]     Larry followed Luedeman in his car. He called 911 as he drove, and this time he connected with a dispatcher. Soon thereafter, the Cadillac came to a stop along the road. Larry also stopped his car and watched Luedeman get out of the Cadillac, put on a shirt, and run away into nearby bushes. Larry continued to drive down the road, looking for Luedeman, before returning to the Cadillac. He parked there and waited for the police to arrive. As Larry waited, he saw a white Jeep Cherokee drive by. He took note of the Cherokee because he did not recognize it, and he knew most of the vehicles that were driven by people who lived in the area.

[18]     Police officers arrived, and Larry told them about his encounter with Luedeman, as well as Jerry's encounter with Luedeman on July 4. An officer took an inventory of the contents of the Cadillac. He also shared the vehicle's identification number with dispatch and learned that it had been reported as stolen. The officer then had the Cadillac towed to the sheriff's department for a more detailed search.

[19]     Meanwhile, another officer contacted Jerry and took a report of the July 1 and July 4 incidents on Jerry's property. Other officers searched the area where

Luedeman had abandoned the Cadillac, but they did not find anyone. Luedeman later stated that during this period of time, he was concealed in bushes in the area, and he stayed there for several hours. He saw police cars pass by during that time but did not approach them. An additional officer went to the George property and discovered that the house's back door was ajar, but no one was there.

[20] Next, Larry went home, where he changed clothes and got a different vehicle. He picked up his father, and they drove past the spot where Luedeman had abandoned the Cadillac. They soon saw a teenage boy near the road, carrying a bundle of firewood. When they stopped the car, the teenager asked to use their phone, claiming he was gathering firewood for his grandmother. As Larry spoke with the teenager, he concluded the teenager's story was false and that the teenager might be connected to Luedeman. Larry attempted to take the teenager's picture, but he initially turned away. The teenager eventually let Larry take his picture and told him that his last name was George. At that point, Larry and his dad drove off and returned to Larry's father's house, where he called 911 again.

[21] While they waited, Larry saw the white Jeep Cherokee drive past. He got back in his car and drove to the spot where he had last seen the teenager. Larry then parked his car behind tall weeds. Next, Larry saw the Cherokee drive by again. Luedeman was driving, and the teenager was in the front passenger seat. Larry followed the Cherokee and called 911 for a third time. He reported the

Cherokee's license number to the dispatcher, as well as Luedeman's description.

[22] Several officers, including Jackson County Sheriff's Deputy Clint Burcham, were dispatched to locate Larry and the Cherokee. The dispatcher shared with the deputies Larry's description of the driver of the Cherokee. Deputy Burcham thought the description resembled Luedeman, with whom he had met at Luedeman's residence within the past thirty days.

[23] Larry followed Luedeman for fifteen miles, entering the community of Leesville in neighboring Lawrence County. Eventually, the Cherokee stopped and Luedeman got out. He approached a mailbox, opened it, and appeared to read the mail. Larry drove by, looking at Luedeman "very carefully." *Id.* at 18.

[24] Larry then drove to a location north of Leesville, where he met with several officers from Jackson and Lawrence Counties. The officers followed Larry to the house where he believed he had last seen Luedeman, but Larry had misidentified the house. Larry led the officers to a second house, but while they were there another officer reported via radio that he had found the Cherokee at a convenience store in Leesville. The officers gathered at the vehicle's location and spoke to the driver, Michael George ("Michael"). He was accompanied by his son, a teenage boy. Michael stated that Luedeman had been in his Cherokee earlier in the day.

[25] After that encounter, an officer sought a search warrant for Luedeman's home. Meanwhile, another officer prepared photographic lineups that included a

photograph of Luedeman. Later that day, Larry and Jerry examined the lineups, outside of each other's presence. They each identified Luedeman as the man who had pointed a gun at them.

[26] After obtaining a search warrant, a team of officers arrived at Luedeman's house later in the day on July 5. The officers entered the home, but no one was present. During a search of the house, they discovered several tackle boxes, ten fishing poles, and driver's licenses for Roseanne George and her daughter, Amber Mikels (who was also deceased). They also found a Sawzall and a set of Tasco binoculars. The officers seized those materials and left.

[27] In the early morning hours of July 6, an officer returned to Luedeman's house, looked in a window, and saw him, apparently asleep on a couch. The officer shouted at Luedeman to get his attention. Luedeman got up and, in defiance of the officer's order to come outside, ran into another room, out of sight. Numerous officers, including members of the Indiana State Police's SWAT Team, arrived and surrounded Luedeman's house. Luedeman eventually surrendered without incident.

[28] Later in the day on July 6, an officer obtained another search warrant for Luedeman's house. This time, the officers seized a large white cooler.

[29] One of George's grandchildren later identified the drivers' licenses, as well as curtains found in the back of the Cadillac, as having been taken from George's vacant house. None of George's family members had given Luedeman permission to enter the house and take property.

[30] Meanwhile the police performed a detailed search of the Cadillac, which revealed that someone had put tape on the exterior, in preparation for painting. In addition, the wiring had been exposed and a new wire led from the ignition to the battery, apparently in an attempt to hotwire the vehicle. Finally, someone had connected a module to the Cadillac's rear lights, apparently in an attempt to modify the lights. The police subsequently returned the Cadillac to Caudell. He determined that it had been partially repainted and the interior was damaged. In addition, he noticed someone had exposed and altered the vehicle's wiring. The Cadillac would not start.

[31] On July 8, 2019, the State filed an array of charges against Luedeman related to his encounters with Jerry and Larry and the theft of the Cadillac. On July 25, the detectives asked Jerry to look at items they had seized from the Cadillac and Luedeman's house. Jerry recognized three fishing poles, a tackle box, a Sawzall, a set of binoculars, a cooler, bolt cutters, and a hand pump as having been stolen from his property.

[32] The State amended the charging information several times. When the jury trial began on January 28, 2020, Luedeman faced the following charges:

| Count | Offense | Key Charging Details |
|-------|---------|----------------------|
| I | Armed burglary, a Level 2 felony | July 4, 2019 – Jerry Fox's property |
| II | Armed burglary, a Level 2 felony | July 5, 2019 – Roseanna George's building |

| | | |
|---|---|---|
| III | Armed robbery, a Level 3 felony | July 4, 2019 – Jerry Fox |
| IV | Armed robbery, a Level 3 felony | July 5, 2019 – Larry Fox |
| V | Burglary, a Level 5 felony | July 1, 2019 – Jerry Fox's shed |
| VI | Armed intimidation, a Level 5 felony | July 4, 2019 – Jerry Fox |
| VII | Armed intimidation, a Level 5 felony | July 5, 2019 – Larry Fox |
| VIII | Theft with a prior conviction, a Level 6 felony | July 4, 2019 – Jerry Fox's property |
| IX | Theft with a prior conviction, a Level 6 felony | July 5, 2019 – Roseanna George's property |
| X | Pointing a firearm, a Level 6 felony | July 4, 2019 – Jerry Fox |
| XI | Pointing a firearm, a Level 6 felony | July 5, 2019 – Larry Fox |
| XII | Impersonation of a public servant, a Level 6 felony | July 4, 2019 – told Jerry Fox he was a police officer |
| XIII | Auto theft, a Level 6 felony | Between July 1 and July 5, 2019 – theft of the Cadillac |
| XIV | Theft with a prior conviction, a Level 6 felony | July 1, 2019 – Jerry Fox's property |

The State also filed an habitual offender sentencing enhancement. The trial court established a bifurcated trial process, in which the habitual offender enhancement, and the question of whether Luedeman had a prior theft conviction that would elevate the three theft charges to Level 6 felonies, would be decided in a second trial, if necessary.

[33] Luedeman testified at trial and, although he presented a different version of events, he admitted he was the person Jerry encountered on his property in the early morning hours of July 4, 2019. He further admitted he was the person Larry had met on the George property in the early morning hours of July 5, 2019, although he also presented a different version of that encounter.

[34] The jury determined Luedeman was guilty as charged, except that he was not guilty of Count V, Level 5 burglary; and for counts X and XI, he was guilty of pointing a firearm as a Class A misdemeanor rather than a Level 6 felony. Next, Luedeman waived his right to the second half of the bifurcated trial, admitting he had a prior theft conviction that would enhance the three theft charges to Level 6 felonies. He further admitted that he is an habitual offender.

[35] At the sentencing hearing, the court determined that Count VIII (theft) should merge into Count III (armed robbery) and Count IX (theft) should merge into Count IV (armed robbery). The court imposed an aggregate sentence of forty years. This appeal followed.

[36] Luedeman challenges the sufficiency of the evidence supporting his convictions, and he claims his sentence is inappropriate in light of the nature of the offenses and his character.

# 1. Sufficiency of the Evidence

[37] Larry argues the State failed to present sufficient admissible evidence to sustain his convictions. Our standard of review is well established:

> In reviewing a sufficiency of the evidence claim, the Court neither reweighs the evidence nor assesses the credibility of the witnesses. We look to the evidence most favorable to the verdict and reasonable inferences drawn therefrom. We will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt.

*Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002) (citations omitted).

[38] Luedeman first argues that Jerry Fox and Larry Fox's testimony must be disregarded as incredibly dubious, and that the convictions that are based on their testimony (including the burglary and robbery charges) must be reversed.

[39] In general, it is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Drane v. State*, 867 N.E.2d 144 (Ind. 2007). A limited exception to this rule is known as the "incredible dubiosity" test. *Moore v. State*, 27 N.E.3d 749, 755 (Ind. 2015). Under this test, a court will impinge upon a jury's duty to judge witness credibility only "'where a sole witness presents inherently contradictory testimony which is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of the appellant's guilt.'" *Id.* (quoting *Tillman v. State*, 642 N.E.2d 221, 223 (Ind. 1994)). The test is a difficult standard to meet, applying only to testimony "which 'runs counter to human experience' and that reasonable persons could not believe." *Edwards v. State*, 753 N.E.2d 618, 622 (Ind. 2001) (quoting *Campbell v. State*, 732 N.E.2d 197, 207 (Ind. Ct. App. 2000)).

[40]     Regarding Luedeman's July 4, 2019 encounter with Jerry Fox, Luedeman argues Jerry's version of events is not to be believed because Jerry admitted his vision is impaired in one eye. But Jerry testified unequivocally, and without any contradictions in his own testimony, that he saw Luedeman illuminated by his truck's headlights. He also described, without equivocation, Luedeman's fake police uniform and handgun. In addition, Jerry's description of their encounter is supported by circumstantial evidence, specifically that items stolen from his shed and semi-trailer that were later discovered in Luedeman's house. Further, Larry saw crushed cornstalks by the driveway, in the spot where Jerry said Luedeman had driven past his truck.

[41]     Luedeman also points to his own trial testimony, in which he denied having a gun, denied claiming to be a police officer, and denied wearing a police officer's uniform. Luedeman further testified that he entered the property to look at some lumber, and Jerry was the person who drew a handgun during their encounter. The incredible dubiosity test addresses only conflicts within a witness's testimony, not conflicts with another witness's versions of events.

[42]     Similarly, Luedeman argues Larry's account of their encounter at the George property in the pre-dawn hours of July 5, 2019, should be disregarded because: (1) there is no corroborating evidence; and (2) Luedeman testified that he was unarmed and Larry was the aggressor, ramming his car into the Cadillac. We disagree. Larry's testimony, like his brother's testimony, was unequivocal and not internally contradictory. Further, there is corroborating evidence of Larry's version of events. Although Luedeman claimed he was the victim of Larry's

aggression and had done nothing wrong, he also admitted that after he drove away and abandoned the Cadillac, he hid in some bushes for hours and chose not to approach any police officers. In addition, items stolen from George's home were found in Luedeman's house, undercutting Luedeman's claim that he entered George's home only to access running water. Further, Luedeman's contradictory testimony about the encounter is irrelevant for purposes of the incredible dubiosity test.

[43] In summary, neither Jerry nor Larry's testimony was incredibly dubious. Resolving the conflicts between their testimony and Luedeman's testimony was the jury's job, and we decline to second-guess its work. *See Whatley v. State*, 908 N.E.2d 276 (Ind. Ct. App. 2009) (affirming conviction for murder despite defendant's claim of incredible dubiosity; defendant did not point to inherent contradictions in any witness's testimony, but instead pointed out conflicts among the witnesses' testimony), *trans. denied*.

[44] Next, Luedeman challenges his conviction of Level 6 felony theft of the Cadillac. To obtain a conviction as charged, the State was required to prove beyond a reasonable doubt that (1) Luedeman (2) knowingly or intentionally (3) exerted unauthorized control (4) over a vehicle owned by J & A Auto (5) with the intent to deprive J & A Auto of the vehicle's value or use. Ind. Code § 35-43-4-2(a)(1)(B)(ii).

[45] Luedeman does not dispute that the Cadillac had been stolen from J & A Auto, and he concedes that he drove it on July 4 and July 5, 2019. He instead claims

he did not steal the Cadillac, did not know it was stolen, and that an ex-girlfriend had allowed him to use it.

[46] The mere possession of stolen property may be sufficient to support a conviction of theft, but only where the property was "recently stolen." *Thacker v. State*, 62 N.E.3d 1250, 1252 (Ind. Ct. App. 2016). In Luedeman's case, Jerry and Larry saw him driving the stolen Cadillac almost two weeks after it was reported stolen, and Luedeman admits to having driven the Cadillac during that time. That span of time does not qualify as "recently stolen." *See id.* (mere possession of vehicle six days after it was stolen, standing alone, is insufficient proof of defendant's knowledge that it was stolen).

[47] Our analysis does not end there. We must review the record to determine whether there is additional evidence that establishes Luedeman knew the car was stolen. "Possession of recently stolen property when joined with attempts at concealment, evasive or false statements, or an unusual manner of acquisition may be sufficient evidence of knowledge that the property was stolen." *Purifoy v. State*, 821 N.E.2d 409, 414 (Ind. Ct. App. 2005), *trans. denied*.

[48] Luedeman stated that his ex-girlfriend brought the Cadillac to his house shortly after June 19, 2019. It remained at his house, except when he or others drove it. The police officer who searched the vehicle determined that someone had put masking tape on it, in preparation for painting. Luedeman admitted he had applied the tape.

[49] In addition, the officer who searched the Cadillac noticed that a small square box with wires had been connected to the rear of the vehicle, near the license plate, possibly to alter the lighting system. Also, the person who took the Cadillac from J & A Auto had driven off with the key, but the officer who searched the vehicle after Luedeman abandoned it determined that the wiring on the car had been exposed and tampered with, perhaps to hotwire it, and the key was not found.

[50] In addition to the obvious alterations to the Cadillac that were consistent with a stolen vehicle, Luedeman's behavior indicates that he knew the car was stolen. He did not give his name to Jerry or Larry, even after Larry requested it. Further, Luedeman drove away from the George property, after pointing a gun at Larry, and abandoned the Cadillac on foot after it quit working. Finally, Luedeman admitted he had hidden in bushes for several hours afterwards and did not attempt to contact the police, even though he saw them driving by. A jury could have determined from these circumstances beyond a reasonable doubt that Luedeman knew the car was stolen. *See Thacker*, 62 N.E.3d 1250 (affirming conviction for auto theft; damage to the vehicle consistent with breaking into it, and defendant's flight when the police arrived, was sufficient evidence that defendant knew the vehicle was stolen). We affirm Luedeman's auto theft conviction.

## 2. Inappropriateness of Sentence

[51] Luedeman argues that his sentence of forty years is too long and asks the Court to reduce it by an unspecified amount. Article 7, section 6 of the Indiana

Constitution authorizes the Court to review and revise sentences "to the extent provided by rule." This constitutional authority is implemented through Appellate Rule 7(B), which provides that the Court may revise a sentence otherwise authorized by statute "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."

[52] "[W]e must and should exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Stewart v. State*, 866 N.E.2d 858, 866 (Ind. Ct. App. 2007). Deference to the sentencing decision "should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[53] Whether a sentence should be deemed inappropriate turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and other factors. *Cardwell v. State*, 895 N.E.2d 1219 (Ind. 2008). A defendant bears the burden of persuading the appellate court that the sentence has met this inappropriateness standard of review. *Childress v. State*, 848 N.E.2d 1073 (Ind. 2006).

[54] To assess whether a sentence is inappropriate, we look first to the statutory range established for the class of the offense. When Luedeman committed his offenses, the sentencing statutes provided:

| Offense | Advisory Sentence | Minimum Sentence | Maximum Sentence | Statute |
|---|---|---|---|---|
| Level 2 felony | 17 and ½ years | 10 years | 30 years | Ind. Code § 35-50-2-4.5 (2014) |
| Level 3 felony | 9 years | 3 years | 16 years | Ind. Code § 35-50-2-5 (2014) |
| Level 5 felony | 3 years | 1 year | 6 years | Ind. Code § 35-50-2-6 (2014) |
| Level 6 felony | 1 year | six months | 2 and one-half years | Ind. Code § 35-50-2-7 (2019) |
| Class A misdemeanor | N/A | N/A | 1 year | Ind. Code § 35-50-3-2 (1977) |

In addition, a person found to be an habitual offender for a Level 1 through Level 4 felony may be sentenced to an additional fixed term of between six and twenty years. Ind. Code § 35-50-2-8(i) (2017).

[55] On Count I, armed robbery involving Jerry Fox, the trial court sentenced Luedeman to an aggravated sentence of twenty-five years, enhanced by fifteen years for being an habitual offender. The court further sentenced Luedeman to an aggravated sentence of twenty-five years on Count II, armed robbery involving Larry Fox. The trial court also imposed aggravated sentences on the remaining charges, but: (1) the court imposed sentences less than the

maximum amount for all but two charges; and (2) the court ordered all sentences to be served concurrently. As a result, Luedeman's total sentence of forty years is far short of his maximum possible sentence.

[56] Turning to the nature of the offenses, Luedeman's course of criminal misconduct is troubling. Jerry Fox and Larry Fox separately confronted Luedeman on July 4, 2019, and July 5, 2019, respectively, on land Luedeman did not have permission to enter and while Luedeman was in possession of other people's property. Instead of surrendering, in each confrontation Luedeman chose to escalate the situation by pointing a handgun at a much older man who posed no threat to him. It also reflects negatively on Luedeman that, having fled from Jerry Fox's property on July 4, he chose to continue his criminal misconduct on July 5, at the George property. Finally, when a police officer found Luedeman at home and ordered him to surrender, he refused to do so, requiring numerous officers, including members of the State Police's SWAT team, to surround his house for several hours until he ultimately surrendered without incident.

[57] As for the character of the offender, Luedeman was forty-one years old at sentencing, with no dependents. He has an extensive criminal record. The habitual offender sentencing enhancement in this case is based on prior convictions for theft and child molesting. Luedeman has accrued two other felony convictions of theft, as well as felony convictions of unlawful possession of a syringe, resisting law enforcement, and failure to register as a sex offender. In addition, he has misdemeanor convictions of resisting law enforcement

(twice), driving while suspended (twice), operating a vehicle while intoxicated, disorderly conduct, and criminal recklessness. Not only has Luedeman continued to commit crimes involving other people's property, he has also escalated his wrongdoing to include armed robbery. In addition, he has been placed on probation five times, and violated the terms of probation in four of those cases, demonstrating that he is a poor candidate for alternatives to incarceration.

[58] Luedeman has a GED, but there is limited evidence of his employment history. At the time he committed the current offenses, he worked at a garage on a temporary basis, paid only in cash. In summary, Luedeman has failed to demonstrate his sentence is inappropriate in light of the nature of the offense or his character.

# Conclusion

[59] For the reasons stated above, we affirm the judgment of the trial court.

[60] Affirmed.

Bradford, C. J., and Altice, J., concur.