

FILED

Feb 24 2017, 8:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| C.S., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | February 24, 2017 <br><br> Court of Appeals Case No. <br> 15A01-1606-JV-1423 <br><br> Appeal from the Dearborn Circuit Court <br><br> The Honorable James D. Humphrey, Judge <br><br> Trial Court Cause No. <br> 15C01-1509-JD-136 |

**Mathias, Judge.**

[1] C.S., then a nine-year-old boy, appeals his adjudication as a delinquent child and the true finding in Dearborn Circuit Court that he molested his then three-year-old stepsister A.G., a Level 4 felony if done by an adult. Concluding that A.G.'s testimony was not incredibly dubious, we affirm.

# Facts and Procedural Posture

[2] C.S. is the son of Bretina Craft ("Bretina"). At the time of this case, he lived with his mother and her long-time boyfriend, David Gray ("David"), whom C.S. thinks of as his stepfather,[1] in Dearborn County, Indiana. C.S.'s father abandoned the family some years ago and now lives in Arkansas.

[3] David was once married to Cheryl Isenhart ("Cheryl"), but they divorced. A.G. and her older brother J.G. are Cheryl and David's children. At the time of this case, A.G. and J.G. usually lived with Cheryl and her new husband Brad, but they would sometimes go to David and Bretina's house to stay for the weekend.

[4] In July 2014, the Indiana Department of Child Services began investigating David and Bretina for neglect, prompted by a report, allegedly Cheryl's, that C.S., then nine years old, had molested A.G. while she was staying at David and Bretina's house. On July 11, 2014, A.G. and J.G. were interviewed at the Children's Advocacy Center of Southeastern Indiana, where investigators are specially trained in the difficult, delicate task of interviewing child witnesses. A.G., three years old at the time, did not say that C.S. or anyone else had touched her wrongly.[2] However, observers thought she spoke, thought, and

---

[1] C.S. is thus not technically A.G.'s stepbrother, but C.S. and others usually referred to David as C.S.'s stepfather and to A.G. as C.S.'s stepsister.

[2] All interviews at the Children's Advocacy Center are recorded. A copy of A.G.'s July 11, 2014, interview has been offered to us as part of the record in this appeal. It is not, however, because it was never admitted below. Tr. p. 87 (sustaining C.S.'s objection to admission).

acted erratically during the interview. The neglect allegations were deemed unsubstantiated and the investigation was closed.

[5] In April 2015, Dearborn County law enforcement reopened the investigation, now focused on C.S. rather than David and Bretina. On April 13, 2015, A.G. and J.G. were again interviewed at the Children's Advocacy Center ("the CAC interviews"). This time, A.G., now four years old, said that C.S. had come into her room one night while she and J.G. were staying with David and Bretina. C.S. had taken her clothes off while she was trying to sleep, put his penis inside her vagina, and kissed her on the lips.

[6] Detective John Vance ("Vance") of the Dearborn County sheriff's office, the lead investigator, had known David and his family since David was a child. David and Bretina did not think that C.S. had done as A.G. said. They thought Cheryl had encouraged A.G. to make up the allegation out of antipathy toward them and C.S. When they offered to furnish Vance with evidence to this effect, Vance agreed to delay bringing his case to the prosecutor. Some months later, David and Bretina gave Vance a video of Bretina, A.G., and J.G., which appeared to show[3] the children admitting they had not been truthful with investigators. Vance watched the video but concluded that Bretina's questioning

---

[3] This recording was discussed and referred to repeatedly below but was never admitted at the delinquency hearing.

of the children was too leading and suggestive to undermine what A.G. had said in her CAC interview.

[7] On September 11, 2015, the State petitioned Dearborn Circuit Court to adjudicate C.S., now ten, a delinquent child for what would be Level 4 felony child molesting if done by an adult. On February 22, 2016, the court held a hearing to determine whether the video of A.G.'s CAC interview was admissible under Indiana's "protected person" statute. *See* Ind. Code § 35-37-4-6. This statute allows reception of a child victim's otherwise inadmissible hearsay statement if certain conditions are met, *id.* § (d), among them that the child be available for cross-examination at the admissibility hearing. *Id.* § (f)(1). Accordingly, A.G., now five, testified and was cross-examined on February 22, 2016. J.G. testified and was cross-examined as well, though the video of his CAC interview was concededly inadmissible under the statute because it protects only "victim[s]," *id.* § (a), which J.G. was not alleged to be. On February 29, 2016, the court ruled A.G.'s CAC interview admissible under the statute.

[8] On February 29, 2016, the court held a delinquency hearing. A.G. and J.G. were not made to testify a second time; their testimony at the February 22, 2016, admissibility hearing was incorporated by the parties' agreement, and A.G.'s CAC interview was admitted. C.S. took the stand in his own defense and denied the allegations against him. After hearing evidence and argument, the court took the matter under advisement. On March 9, 2016, the court adjudicated C.S. a delinquent child.

[9] At a dispositional hearing on April 11, 2016, C.S. was ordered to ninety days in Dearborn County juvenile detention, all suspended, and to one year's reporting probation, subject to extensive conditions.

[10] This appeal followed. C.S. claims his adjudication was unsupported by sufficient evidence because A.G.'s testimony was incredibly dubious.

## Standard of Review

[11] Though juvenile adjudications are not criminal matters, *Jordan v. State*, 512 N.E.2d 407, 409 (Ind. 1987), when the State petitions to have a child adjudicated delinquent for an act that would be a crime if done by an adult, due process requires the State to prove its case beyond a reasonable doubt. *Al-Saud v. State*, 658 N.E.2d 907, 908 (Ind. 1995) (citing *In re Winship*, 397 U.S. 358, 368 (1970)). When reviewing whether the State's evidence was sufficient to meet this burden, our standard is familiar. We view the facts and the reasonable inferences from them in the light most favorable to the true finding below. *Id.* We neither reweigh the evidence nor, in the ordinary case, re-evaluate witness credibility. *Id.* We will affirm unless no reasonable trier of fact could have found the elements of the crime proved beyond a reasonable doubt. *Id.*

## Discussion and Decision

[12] We may, and ordinarily do, uphold findings of guilt beyond a reasonable doubt supported only by the uncorroborated testimony of a single witness, even the victim's. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). We may make an exception, however, if that testimony is incredibly dubious. *Moore v. State*, 27

N.E.3d 749, 754 (Ind. 2015). An appellant seeking application of the incredible dubiosity rule must show that the judgment against him was based on the testimony of a single witness, unsupported by any circumstantial evidence, which was inherently improbable or inherently contradictory, equivocal, or coerced. *Id.* at 755-56. Though the standard is "not impossible" to meet, it is "difficult." *Id.* at 756 (internal quotation and citation omitted). The challenged testimony must be so ambiguous, inconsistent, convoluted, or contrary to human experience that no reasonable person could credit it. *Id.* (citing cases so holding).

## I. C.S. Satisfies the Threshold Requirements of the Incredible Dubiosity Rule

[13] It is uncontested that no direct physical or any circumstantial evidence supported the true finding below. C.S. was adjudicated on the basis only of directly inculpatory witness testimony.

[14] The State argues that A.G.'s was not the only such testimony because J.G. too gave testimony inculpating C.S. However, this is not so. Two of J.G.'s statements are at issue: his April 13, 2015, CAC interview and his testimony at the February 22, 2016, admissibility hearing, incorporated by party agreement at the delinquency hearing. The latter only tended to exculpate C.S., and the former was never admitted.

[15] At the admissibility hearing, J.G. either could not remember what happened or denied that anything had happened at all. He did not remember giving his CAC interview. Tr. p. 15. When asked whether "anybody's ever done anything to

[A.G.] they shouldn't have done," he answered repeatedly, "Not that I've remembered." Tr. p. 16. He denied knowing whether there were parts on a person's body that should not be touched. Tr. p. 17. He denied ever seeing anyone wrongly touch A.G. *Id.* "Nothing really happened," he concluded. Tr. p. 18. Nothing in J.G.'s hearing testimony supported the true finding below.

[16] While the potential admissibility of J.G.'s CAC interview was several times discussed, it was never offered and admitted. At the February 22, 2015, admissibility hearing, the State, acknowledging that the protected person statute did not protect J.G., offered his CAC interview as a recorded recollection. *See* Ind. Evidence Rule 803(5). The court declined to entertain the State's offer as outside the scope of the admissibility hearing. Tr. p. 63. The State relented. *Id.*; *see also* Appellant's App. p. 68 (trial court ruling A.G.'s CAC interview admissible under the protected person statute) ("The Court makes no ruling on [J.G.'s] statement at this time, but leaves that issue open for argument at the scheduled [delinquency hearing].").

[17] At the delinquency hearing, however, the State never re-offered J.G.'s CAC interview or laid any foundation for its admission. The State had burned digital copies of A.G.'s and J.G.'s CAC interview recordings to the same disc, denominated "Exhibit 2" at the admissibility hearing. It then offered A.G.'s CAC interview at the delinquency hearing "based on the Court's ruling . . . that the Child Hearsay [i.e., protected person statute] Motion is being granted . . . ." Tr. p. 83. The court ruled that "what's previously been admitted through a Child Hearsay hearing as State's Exhibit '2' will also be admitted . . . for

purposes of this [delinquency] hearing." Tr. p. 84. This cannot refer to J.G.'s CAC interview, which was expressly excluded from consideration at the admissibility hearing as irrelevant.

[18] Moreover, the State never laid a foundation for the admission of J.G.'s CAC interview. The State argues that, because C.S. did not specifically object to the presence of J.G.'s CAC interview on the same disc as A.G.'s when Exhibit 2 was offered at the delinquency hearing, that interview should be deemed admitted. Appellee's Br. p. 8 n.1. This argument misapprehends the applicable burden of proof and, if accepted, would open the door to all manner of mischief.[4] The *proponent* of evidence has the burden to show its admissibility. *Ground v. State*, 702 N.E.2d 728, 731 (Ind. Ct. App. 1998) ("The hearsay exceptions reflect the concern that hearsay evidence be admitted only when the proponent can demonstrate that the evidence bears the necessary indicia of reliability."). However, the State never established any predicate of the recorded-recollection exception to the hearsay rule, even though expressly

---

[4] Indeed, it is not even clear that C.S.'s counsel knew or should have known that J.G.'s CAC interview was on the same disc as A.G.'s when the disc was offered at the delinquency hearing. When the court asked the prosecutor whether he "ha[d] a new copy [of the disc] that [he] wish[ed] to admit," the prosecutor replied, "Well, we'll just admit—keep that as Exhibit '2' for the purposes of this [delinquency hearing] . . . ." Tr. p. 84. The prosecutor did not say the discs were the same; he said the exhibit number should be retained. The disc we have in the record before us is entitled only "[G.] CAC 4-13-15." Unless counsel knew the discs at the admissibility and delinquency hearings were the same, he would have no reason to expect that "Exhibit 2" at the delinquency hearing in fact contained copies of both interviews. The law of evidence does not contemplate that a party declines at his peril to demand full accounting of all electronic files potentially on any physical storage medium offered to the court.

invited by the court to do so at the delinquency hearing. An exhibit is not admitted into evidence merely because a lawyer hands it to a judge.

[19] We therefore proceed to consider whether A.G.'s testimony, standing alone, was incredibly dubious.

## II. A.G.'s Hearing Testimony and CAC Interview, Taken Together, Were Not Incredibly Dubious

[20] We begin by remembering that "[t]he balance between understanding what quite young children are telling us and ensuring that [findings beyond a reasonable doubt] are based on sufficient evidence is not easy to achieve." *Smith v. State*, 779 N.E.2d 111, 116 (Ind. Ct. App. 2002), *trans. denied*.

[21] We are mindful that "a young child in an adversary courtroom setting may demonstrate a degree of confusion and inconsistency," *Hill v. State*, 646 N.E.2d 374, 378 (Ind. Ct. App. 1995), not to be expected in adults or even older children. We are also mindful that ambiguities, inconsistencies, and even wholesale revisions of testimony do not require reversal if there was any basis on which a reasonable fact-finder could choose between conflicting accounts or reconcile inconsistencies. *See, e.g., Edwards v. State*, 753 N.E.2d 618, 623 (Ind. 2001) ("[T]he jury had the ability to perform its role as a trier of fact . . . . [Witness] testified . . . he attempted to change his story because he was scared. The jury would not be unreasonable in accepting this . . . ."). Finally, we recognize that the bar for finding such a basis has been set very low. *See Smith v. State*, 34 N.E.3d 1211, 1222 (Ind. 2015) (affirming conviction of black man for

robbery shown on video to have been committed by white woman, on testimony of white woman who had already pleaded guilty to same robbery).

[22] In this light, we find that, while the stress of the live admissibility hearing produced testimony from A.G. that was to some degree equivocal, contradictory, and suggestive of manipulation, these defects were absent in the controlled, non-adversarial environment of her CAC interview.[5] Crucially, on one point A.G. never wavered: that C.S. touched her where he was not supposed to when she was on his bed at Bretina and David's house. We cannot say that no reasonable fact-finder could have believed her.

[23] At the admissibility hearing, A.G. equivocated over simple questions. *See, e.g.,* Tr. p. 27 (what is mother's name). She equivocated over more important questions too. *See, e.g.,* Tr. pp. 36-37 (whether she was afraid of or wanted to be around C.S.). Most injurious to the State's case, however, was A.G.'s testimony

---

[5] In comparing A.G.'s hearing testimony and CAC interview, we note that our supreme court seems to suggest that incredible dubiosity review be confined to trial testimony only. "In discussing inherent probability . . . , we found in *Moore* [*v. State*, 27 N.E.3d 749 (2015),] it was satisfied only when the witness's trial testimony was inconsistent within itself, not that it was inconsistent with other evidence or prior testimony." *Smith*, 34 N.E.3d at 1221. If this were the rule, it would be difficult to apply here, as neither the hearing testimony nor the interview were "trial testimony," but prior statements introduced as substantive evidence at "trial." However, we do not think this is the rule. *Smith* and *Moore* relied on a line of cases holding simply that "[t]he fact that a witness gives trial testimony that contradicts earlier pre-trial statements does not *necessarily* render the trial testimony incredibly dubious." *Murray v. State*, 761 N.E.2d 406, 409 (Ind. 2002) (citing *Davenport v. State*, 689 N.E.2d 1226, 1230 (Ind. 1997)) (emphasis added). The forum in which, or the vehicle by which, substantive evidence given by the same witness has been admitted is not per se relevant to the dispositive legal question: Was there a basis on which a reasonable trier of fact could perform its function by weighing competing evidence? Such a basis is much more readily discoverable when two contradictory statements are separated in time, and often in incentive structure, as pretrial and trial statements are, rather than when given in one sitting on the witness stand.

that her statements might not have been exclusively her own, supporting C.S.'s theory that Cheryl was the motor of the accusations against him:

[A.G.:]     I did talk to my mom about [what happened].

[C.S.:]     Did your mom tell you what to say about it?

[A.G.:]     Hmm . . .

[C.S.:]     Yes?

[A.G.:]     Yes.

[C.S.:]     What'd your mom say to say?

[A.G.:]     Do not . . . I can't remember.

. . .

[C.S.:]     When's the first time you remember telling somebody something bad happened?

[A.G.:]     I don't know.

[C.S.:]     Did you tell somebody something that happened or did somebody tell you something bad happened?

[A.G.:]     Somebody told me that happened.

[C.S.:]     Somebody told you that something bad happened?

[State's objection overruled.]

[A.G.:]     Yeah.

Tr. pp. 36-37, 39-40. While this testimony might support C.S.'s theory, it is far from conclusive of it. There is ambiguity in A.G.'s testimony as to whether A.G. had been given a story to tell made from whole cloth, or simply received

help and encouragement from her mother in expressing herself, and had to rely on an adult to supply the normative content ("bad") of what she said had happened to her. We think a reasonable trier of fact could find the latter.

[24] On the critical question, A.G. did not equivocate:

[State:]    [A]re there parts on people's bod[ies] that are private?

[A.G.:]    I don't want to talk about that.

[State:]    I know. . . . [W]hen you wear a bathing suit, are there parts on your body that it covers up?

. . .

[A.G.:]    Yes.

[State:]    Okay. And are some of those parts places that nobody should touch but you? . . . .

[A.G.:]    Yes.

[State:]    Okay. . . . [A]nd has anybody ever touched you in any of those places?

[A.G.:]    Yes.

[State:]    Who?

[A.G.:]    [C.S.].

[State:]    Okay. Where did that happen?

[A.G.:]    My dad's in his bed.

. . .

[State:] [D]o you have a name for the part of the body that he was touching?

[A.G.:] No.

Tr. pp. 31-32. Though free of equivocation, there remains some ambiguity in A.G.'s testimony on this point. However, "[t]he unfamiliarity of a young victim with anatomical terms does not make her incompetent to testify when the facts are explained in simple or childlike language which the judge and jury could understand." *Smith*, 779 N.E.2d at 115. While A.G. did not name the body part C.S. touched or describe it with anatomical precision, the parts on a child's body that are covered by a bathing suit and that no one else is supposed to touch are few in number. A reasonable trier of fact could have concluded that A.G. meant a body part whose touching gives rise to an inference of an "intent to arouse or satisfy the sexual desires" of C.S. or A.G, I.C. § 35-42-4-3(b), as the State was required to prove. *See T.G. v. State*, 3 N.E.3d 19, 24-25 (Ind. Ct. App. 2014) (Intent "may be established by circumstantial evidence and may be inferred from the actor's conduct and the natural and usual sequence to which such conduct usually points"; finding five-year age difference between child accused and child victim probative of sexual intent rather than innocent sexual play), *trans. denied*.

[25] Further, in light of A.G.'s unambiguous, unequivocal CAC interview, we conclude that a reasonable trier of fact could have ascribed the ambiguities and equivocations of A.G.'s hearing testimony to the stresses of public speaking and cross-examination as experienced by one so young as A.G.

[26] During A.G.'s CAC interview, A.G. and the interviewer identified body parts on two schematic drawings of male and female bodies. The interviewer asked A.G. to identify "the private parts" on the female drawing. Ex. Vol., State's Ex. 2 12:55. A.G. identified the groin, calling it "a private," *id.* at 13:12, the buttocks, calling it "a butt," *id.* at :19, the navel, calling it "a belly button," *id.* at :36, and the breasts, calling them "thingies." *Id.* at :45. The interviewer then asked A.G. to do the same with the male drawing. A.G. circled the groin with a marker and spontaneously volunteered, "I hate this." *Id.* at 14:09. "How come?" asked the interviewer. *Id.* at :12. "When he went on my private!" said A.G. *Id.* at :15.

[27] "He went on my private and tried to kiss me!" she said again. *Id.* at 15:09. "Who did?" asked the interviewer. *Id.* at :12. "[C.S.]!" she answered. *Id.* at :13. "He took off my clothes," she continued, when she "was on his bed trying to sleep." *Id.* at :17. C.S. then kissed her on the lips while he was naked. "You told me this part [pointing to the groin on the male drawing] touched your private?" the interviewer asked. *Id.* at 17:41. A.G. nodded. "Where at on your private?" *Id.* at :44. A.G. pointed to the groin on the female drawing. "Did it stay on the outside of your body or did it go inside your body or something else?" *Id.* at :49. "Inside," replied A.G. *Id.* at :55. "What did that feel like when that happened?" *Id.* at 18:16. "Just like, bad stuff." *Id.* at 18:19. The interview continued for about another ten minutes, during which A.G.'s story did not waver.

[28] In sum, A.G.'s CAC interview was substantial probative evidence of C.S.'s guilt. A.G.'s hearing testimony did not contradict her interview, and what

defects there were in the hearing testimony were reasonably resolvable by the trier of fact in favor of the true finding. A.G.'s statements, taken together, are therefore not incredibly dubious.

## Conclusion

[29]     For the above reasons, the true finding below that C.S. committed what would be Level 4 felony child molesting if done by an adult was supported by sufficient evidence. We therefore affirm C.S.'s adjudication as a delinquent child in all respects.

[30]     Affirmed.


Baker, J., and Pyle, J., concur.