## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 17 2018, 9:18 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew D. Anglemeyer
Marion County Public Defender
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Carylon Young,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

October 17, 2018

Court of Appeals Case No.
18A-CR-845

Appeal from the Marion Superior Court

The Honorable Mark D. Stoner, Judge

Trial Court Cause No.
49G06-1612-MR-46693

**Bailey, Judge.**

# Case Summary

[1] Carylon Young ("Young") appeals his conviction, following a jury trial, for the murder[1] of Margaret Means ("Means"). He raises one issue, namely, whether the State presented sufficient evidence to support his conviction.

[2] We affirm.

# Facts and Procedural History

[3] Kathy Albright ("Albright") ran a ministry for homeless persons called Meet Me Under the Bridge in Indianapolis in November 2016. The ministry served hot meals, passed out clothes, and conducted church services on the weekends. Through this ministry, Albright came to know Ashlee Lane ("Lane"), who came to Meet Me Under the Bridge to eat and attend the church services. Means also attended the services, and Albright knew that Lane and Means were "very good friends." Tr. Vol. II at 99.

[4] Means was wheelchair-bound and homeless on November 17, 2016, and she had been living in a parking lot located behind Lane's apartment building. Means was in a romantic relationship with Young, who took care of Means and helped her move in her wheelchair. On Sundays, Young and Means together attended Albright's homeless ministry. By November 2016, Albright had seen

---

[1] Ind. Code § 35-42-1-1(1).

Young at the ministry for about four months and had seen Means at the ministry for about six months.

[5]  On November 17 at approximately 9:00 p.m, Young got into an argument with an employee at a Family Dollar store near the parking lot where Means lived. Indianapolis Metropolitan Police Department ("IMPD") Officer Jeremey Morris ("Officer Morris") spoke with the employee and Young and then gave Young a trespass warning. During his encounter with Young, Officer Morris observed that Young's demeanor was "argumentative" and Young was "upset." *Id*. at 21-22.

[6]  At approximately 3:30 a.m. the next morning, November 18, off-duty Stinesville police officer Donald Wadsworth ("Officer Wadsworth") was working security at a Speedway gas station near the Family Dollar store. A concerned citizen told Officer Wadsworth that an argument was taking place in a parking lot. While looking for the argument, Officer Wadsworth drove down the street and into the parking lot where Means lived. There, he found Means's dead body lying face up under a sheet on a mattress. Officer Wadsworth called 9-1-1 and IMPD officers arrived to investigate the scene.

[7]  Albright saw Lane on November 20, 2016, the Sunday after Means's death. Albright observed that Lane "was a wreck" and "was shaking, and crying," and Lane then told Albright that she had seen Young kill Means. *Id*. at 76, 100.

[8]  On November 23, 2016, IMPD Homicide Detective Chris Craighill ("Det. Craighill") interviewed Young, who had agreed to talk to Det. Craighill and

had signed a waiver for a buccal swab to be taken for DNA comparison purposes. Young also agreed to have photographs taken of his person. After that, Young "was free to go[,]" and he left the police station. *Id*. at 200.

[9] On November 27, Albright called Det. Craighill to report that she had been contacted by an eyewitness to Means's murder and arranged for Det. Craighill to meet with Lane. The next day, Lane met with Det. Craighill at Albright's ministry. Lane disclosed to Det. Craighill that she witnessed Means being killed, and Lane also identified Young as Means's killer through a photographic lineup.

[10] Albright did not see Young for about three weeks following Means's death. Albright found this "peculiar" because she had seen him at her ministry "every Sunday prior to [Means] being killed" for approximately "four months." *Id*. at 102. When Young eventually returned to Meet Me Under the Bridge on December 4, 2016, he immediately approached Albright and, without any prompting or prior conversation about Means's death, began to "defend[] himself," telling her that he did not kill Means. *Id*. at 108, 220; Appellant's App. Vol. II at 168. Albright witnessed Young go "around to all the other volunteers saying the same thing." *Id*. Lane was present when Young arrived at Meet Me Under the Bridge, and Albright observed that Lane "started freaking out" and was "[c]rying and shaking." *Id*. at 103. Albright informed the police that Young was at her ministry, and the police arrived and arrested Young.

[11]     On December 6, 2016, the State charged Young with two counts of murder,[2] one count of robbery resulting in serious bodily injury, a Level 2 felony,[3] and one count of armed robbery, a Level 3 felony.[4]  Before trial, the State dismissed all charges except one murder charge.

[12]     Young's jury trial took place on February 21, 2018.  An autopsy of Means was admitted into evidence and disclosed that Means had suffered multiple stab wounds to her head, neck, chest, right shoulder, and her forearms.  The forensic pathologist who examined Means's body testified that the most severe injury was to the neck.  Means's skull was also fractured from a "deep" and "severe" injury."  Tr. Vol. II at 162.  Means's injuries were consistent with being stabbed with a knife.  *Id*. at 152-53.  A laboratory report was also admitted into evidence.  And a crime scene specialist testified that DNA consistent with Young's DNA was found in samples taken from under Means's fingernails and on the glass bottle of alcohol found next to Means's body, and both Young's and Means's blood were on the paper bag containing the bottle of alcohol.

[13]     Lane also testified at Young's trial.  She stated that, although she had been diagnosed with bipolar disorder, schizophrenia, and depression, she was taking prescribed medication for these conditions both on the date of trial and on the date that Means was killed.  Lane had known Means for approximately a year

---

[2]  I.C. § 35-42-1-1(1) and (2).

[3]  I.C. § 35-42-5-1.

[4]  *Id*.

before Means's death. According to Lane's testimony, on November 17, Means, Lane, and Young had dinner together at Holy Cross, which Lane described as a "homeless food place." *Id*. at 59. After dinner, Lane walked to her apartment to watch TV. Her cousin, boyfriend, and her cousin's friend were also at her apartment. Lane watched TV for a couple of hours and then walked around the neighborhood and downtown. When Lane returned to her apartment, she heard "screaming, fighting, and cursing." *Id*. at 65. She looked in the parking lot behind her apartment and saw Young and Means arguing. She saw no one else in the parking lot. Lane went into her apartment and could still hear Young and Means yelling.

[14]     After Lane had been in her apartment "for a while[,]" she again went to the back door of her apartment that overlooked the parking lot where Means lived in her make-shift camp. *Id*. at 67. Lane saw Young walk toward his personal tent that was close to the parking lot in which Means had set up camp. Lane went to the parking lot to talk to Means, and Young then returned to Means's camp. Young and Means began to argue again, and Lane went back to her building and into her apartment. Lane then heard screaming, ran outside again, and saw Young stabbing Means with a knife. Lane then saw Young walk away and leave the parking lot, heading downtown. After Young left the scene, Lane went to check on Means and saw that she was bloodied and covered by a sheet. Lane testified that she then called the police and, when they arrived, she told them what she had seen.

On cross-examination of Lane, Young's lawyer brought out several inconsistencies between Lane's trial testimony, her earlier deposition testimony, and her prior statement to the police. Those inconsistencies related to the timing and location of events leading up to the murder, the type of knife Young used to stab Means, what type of alcoholic beverage Young was drinking while arguing with Means, and when and how the crime was reported to the police.

On February 22, 2018, the jury found Young guilty of murdering Means. This appeal ensued.

# Discussion and Decision

Young challenges the sufficiency of the evidence to support his conviction for murder. Our standard of review of the sufficiency of the evidence is well-settled:

> When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id*. We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id*.

*Clemons v. State*, 996 N.E.2d 1282, 1285 (Ind. Ct. App. 2013), *trans. denied*. Moreover, "[a] conviction may be based on circumstantial evidence alone so long as there are reasonable inferences enabling the factfinder to find the

defendant guilty beyond a reasonable doubt." *Lawrence v. State*, 959 N.E.2d 385, 388 (Ind. Ct. App. 2012) (citation omitted), *trans. denied*.

[18]    To support Young's conviction of murder, the State was required to show that Young (1) knowingly or intentionally (2) killed (3) Means. I.C. § 35-42-1-1(1). The State provided evidence that Lane saw Young stab Means, causing Means's death. It also provided evidence that Young's DNA was found at the scene of the crime and under Means's fingernails and that Young's and Means's blood were on the bag containing a bottle found next to Means's dead body. And the State provided additional circumstantial evidence of Young's hostile encounter with a Family Dollar employee earlier that evening, Young's three-week disappearance after Means's murder, and Young's suspicious behavior at Albright's ministry when he returned there. That was sufficient evidence to support Young's conviction.

[19]    However, Young contends that Lane's testimony was "incredibly dubious." This court has recently addressed the rule of incredible dubiousity:

> We may, and ordinarily do, uphold findings of guilt beyond a reasonable doubt supported only by the uncorroborated testimony of a single witness, even the victim's. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). We may make an exception, however, if that testimony is incredibly dubious. *Moore v. State*, 27 N.E.3d 749, 754 (Ind. 2015). An appellant seeking application of the incredible dubiosity rule must show that the judgment against him was based on the *testimony of a single witness, unsupported by any circumstantial evidence*, which was inherently improbable or inherently contradictory, equivocal, or coerced. *Id*. at 755-56. Though the standard is "not impossible"

to meet, it is "difficult." *Id.* at 756 (internal quotation and citation omitted). The challenged testimony must be so ambiguous, inconsistent, convoluted, or contrary to human experience that no reasonable person could credit it. *Id.* (citing cases so holding).

*C.S. v. State*, 71 N.E.3d 848, 851 (Ind. Ct. App. 2017) (emphasis added).

[20] The incredible dubiosity rule does not apply in this case because Lane was not the sole witness and there was circumstantial evidence in addition to Lane's testimony. Police officers testified as to their investigations, including Young's hostility earlier in the evening at a Family Dollar store; expert witnesses testified regarding Young's DNA and blood that were found at the scene of the crime and under Means's fingernails; and Albright testified about Young's three-week disappearance and his suspicious behavior upon his return. It was the jury's responsibility to weigh that evidence and resolve any conflicts. *See Carter v. State*, 44 N.E.3d 47, 54 (Ind. Ct. App. 2015) ("In the absence of incredibly dubious testimony, we will not impinge on the fact-finder's responsibility to judge witness credibility."); *Scott v. State*, 867 N.E.2d 690, 694 (Ind. Ct. App. 2007) ("We must respect the jury's exclusive province to weigh conflicting evidence."), *trans. denied*.

[21] The State provided sufficient evidence to support Young's conviction of murder.

[22] Affirmed.

Mathias, J., and Bradford, J., concur.