## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 15 2019, 6:15 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

## I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tommy J. Graham, Jr.,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | July 15, 2019<br><br>Court of Appeals Case No.<br>18A-CR-2163<br><br>Appeal from the Jackson Circuit Court<br><br>The Honorable Richard W. Poynter, Judge<br><br>Trial Court Cause No.<br>36C01-1609-F4-18 |

**Mathias, Judge.**

[1]     Tommy Graham ("Graham") was convicted in Jackson Circuit Court of two counts of Level 4 felony sexual misconduct with a minor and one count of

Level 5 felony sexual misconduct with a minor. Graham now appeals, arguing whether (1) the trial court abused its discretion when admitting evidence without proper foundation; (2) the evidence was sufficient to support his conviction; and (3) his aggregate sentence of fifteen years is inappropriate in light of the nature of his offense and his character.

We affirm.

## Facts and Procedural History

Following the suicide death of her boyfriend in December 2015, fourteen-year-old L.G. left her home to "get away" temporarily and stayed with a family friend, whom she referred to as "Aunt Becky." Tr. Vol. I, p. 176. Rebecca Graham ("Becky") lived in a mobile home along with her husband, Graham, and their three sons. L.G. stayed with the Graham family for one week and slept in a bedroom with two bunk beds shared by the sons.

On the night of December 12, 2015, L.G. ate dinner with the Graham family, and Graham drank alcohol, specifically vodka, while L.G. drank a beer. Afterwards, L.G. sat around with Becky and Graham and then went to bed around midnight. Graham's sons were already asleep in the bedroom by the time L.G. went to sleep.

About an hour after she fell asleep, L.G. heard someone enter the bedroom. L.G. could not identify who the person was because the room was dark. L.G. felt a man touch her, and this man's size was noticeably larger than any of Graham's sons. The man placed his hand on L.G.'s back and turned her over,

forcing L.G.'s hand onto his erect penis. L.G. heard the man say, "just let me feel," and she knew from the sound of the man's voice that it was Graham. Tr. Vol. I, pp. 201–03. L.G. could smell vodka coming from the man, which Graham had been drinking that night. Graham inserted his fingers repeatedly "in and out" of L.G.'s vagina, sucked on L.G's vagina with his mouth, and licked her genitals with his tongue. *Id.* L.G. estimated that the molestation lasted for approximately thirty minutes, leaving L.G. feeling "gross and awkward" on the bunk bed. *Id.*

[6] The next day, L.G. asked Becky to take her home. When L.G. got to her house, she received a series of personal messages from a Facebook account belonging to Becky. The user of the account eventually identified himself as "Tj," Graham's nickname. In the message exchange, Graham repeatedly said he was sorry for what had happened the previous night during a "conversation" between him and L.G. Tr. Vol. I, pp. 204–05; Ex. Vol., State's Ex. 1 at 5–6. L.G. asked Graham if him and Becky were "done" and told Graham that he needed to tell Becky about what had happened. Ex. Vol., State's Ex. 1 at 8. Graham admitted that his actions were "wrong," but told L.G. that Becky did not "need to know the details of our conversation." *Id.* at 9, 18. L.G. insisted that Graham tell Becky about the sexual assault and said she would if he himself did not. Graham made it clear he would not tell Becky as it would ruin his marriage and damage Becky's relationship with L.G.'s mother. Graham pressured L.G. not to tell anyone about the assault. Graham told L.G. he would likely go to prison if others found out. When L.G. kept pressing Graham

to admit what he had done, Graham responded, "Did I f***k you? No now drop it." *Id.* at 12.

[7] L.G. decided not to tell Becky or her parents about the incident with Graham because it was "embarrassing" and L.G. did not want to "betray" Becky. Tr. Vol. I, pp. 208–09. L.G. did tell her brother and a friend from school, S.G., about the incident with Graham. In June 2016, L.G.'s mother learned of what had happened through the father of L.G.'s friend while the two of them were at work together. L.G.'s parents confronted L.G. about the incident, and L.G. admitted Graham had touched her inappropriately.

[8] L.G. was taken to a hospital and examined by doctors, who referred L.G. to the police. An initial report was filed, and L.G. underwent a forensic interview at the Child Advocacy Center. After the interview, police sent a preservation request to Facebook regarding the chat logs between L.G.'s account and Becky's account from December 13, 2015. Detectives then obtained a warrant to search through the Facebook records, along with a certificate of authenticity signed by Christine Oliveira, Facebook's records custodian assigned to the case. Ex. Vol., State's Ex. 1.

[9] On September 19, 2016, the State charged Graham with two counts of sexual misconduct with a minor as Level 4 felonies and one count of sexual misconduct with a minor as a Level 5 felony. On July 6, 2018, Graham filed a motion in limine, in which he asked the trial court to exclude any evidence of Facebook communications "purportedly sent by the defendant and alleged

victim" on the grounds that there was "no transactional nexus to the defendant" and constituted inadmissible hearsay. Appellant's App. Vol. 2, p. 87. On July 11, 2018, the State filed an habitual offender enhancement against Graham. *Id.* at 93.

[10] A two-day jury trial commenced on July 10, 2018. On the first day of Graham's jury trial, the trial court conducted a hearing on Graham's motion in limine. The trial court declined to issue a ruling at that time. The State called Detective Benjamin Rudolph ("Detective Rudolph") to testify about his role in sending the preservation request to Facebook in efforts to obtain the records of the conversation between Graham and L.G. The State moved to admit Exhibit 1, which consisted of the Facebook conversation between L.G. and Becky's account, and Exhibit 1 was admitted over Graham's hearsay objection. In addition to the Facebook messages, the trial court allowed over Graham's objection a one-minute-eight-second long video of Graham's post-arrest interview dressed in jail clothing with Detective Bob Lucas ("Detective Lucas").

[11] The jury found Graham guilty as charged on all three counts of sexual misconduct with a minor. A separate hearing was held outside the presence of the jury, during which Graham admitted to the habitual offender count. A sentencing hearing was held on August 9, 2018. Graham was sentenced to nine years each for the two counts of Level 4 felony sexual misconduct with a minor and four years for the Level 5 felony sexual misconduct with a minor count, all concurrent. Graham's sentence was enhanced by six years due to the habitual

offender enhancement, for an aggregate sentence of fifteen years. Graham now appeals.

## Discussion and Decision

### I. Authentication of Facebook Messages

Graham argues that the trial court erred in admitting Facebook messages which he alleges were not properly authenticated and, therefore, lacked a proper foundation. A trial court has broad discretion to admit or exclude evidence offered at trial. *Carpenter v. State*, 786 N.E.2d 696, 702 (Ind. 2003). This Court will only reverse a decision to admit evidence where the trial court's decision constitutes a "manifest abuse of discretion [resulting] in the denial of a fair trial." *Ennik v. State*, 40 N.E.3d 868, 877 (Ind. Ct. App. 2015), *trans. denied*. In reviewing the admissibility of evidence at trial, this Court does not reweigh the evidence and considers the evidence in the light most favorable to the trial court's ruling. *See State v. Gray*, 997 N.E.2d 1147, 1150 (Ind. Ct. App. 2013), *trans. denied*; *see also Holbert v. State*, 996 N.E.2d 396, 400 (Ind. Ct. App. 2013), *trans. denied*.

Prior to trial, Graham filed a motion in limine claiming that there was "no transactional nexus" establishing that he actually authored the private messages. Tr. Vol. I, p. 147; Appellant's App. Vol. 2, p. 87. However, at trial, Graham raised no similar objection to the foundation of the evidence when the State moved to admit Exhibit 1. Graham's attorney stated only "I'm going to object on hearsay," and Exhibit 1 was admitted over Graham's objection. *Id.*

Graham's objection at trial preserved the issue of hearsay for appeal and did not extend to the foundational arguments Graham raises. See *Gill v. State*, 730 N.E.2d 709, 711 (Ind. 2000) ("a defendant may not argue one ground for objection at trial and then raise new grounds on appeal."). "Rulings on motions in limine are not final decisions and, therefore, do not preserve errors for appeal." *Swaynie v. State*, 762 N.E.2d 112, 113 (Ind. 2002). Graham's motion in limine was not enough to preserve the issue as to the foundation of State's Exhibit 1. Because Graham did not object at trial to the foundation of Exhibit 1, the arguments he raises regarding the authentication of Exhibit 1 are waived.

[14] Waiver notwithstanding, to lay a foundation for the admission of evidence, the proponent of the evidence must show that it has been authenticated. *Hape v. State*, 903 N.E.2d 977, 989 (Ind. Ct. App. 2009) (citing *Bartlett v. State*, 711 N.E.2d 497, 502 (Ind. 1999)), *trans. denied*. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Ind. Evidence Rule 901(a). But "[a]bsolute proof of authenticity is not required." *Fry v. State*, 885 N.E.2d 742, 748 (Ind. Ct. App. 2008), *trans. denied*. The proponent of the evidence need only establish a reasonable probability that the document is what it is claimed to be. *M.T.V. v. State*, 66 N.E.3d 960, 963 (Ind. Ct. App. 2016), *trans. denied*. Once this is shown, any inconclusiveness regarding the exhibit's connection with the events at issue goes to the exhibit's weight, not its admissibility. *Richardson v. State*, 79 N.E.3d 958, 962 (Ind. Ct. App. 2017), *trans. denied*.

[15] "Letters and words set down by electronic recording and other forms of data compilation are included within Rule 901(a)." *Wilson v. State*, 30 N.E.3d 1264, 1268 (Ind. Ct. App. 2015), *trans. denied*. Moreover, Evidence Rule 901(b) provides a non-exhaustive list of evidence that satisfies the authentication requirement, including: 1) evidence describing a process or system and showing that it produces an accurate result.; and 2) evidence, taken together with all the circumstances, has distinctive characteristics in appearance, contents, or substance. Ind. Evid. R. 901(b). Federal Rule of Evidence 901(b)(4) uses language identical to that of Indiana Rule of Evidence 901(b)(4). "We have previously acknowledged that federal courts have recognized Federal Rule of Evidence 901(b)(4) as one of the most frequently used means to authenticate electronic data, including text messages and emails." Wilson, 30 N.E.3d at 1268.

[16] Here, the content and substance of the Facebook messages, coupled with the circumstantial evidence from L.G.'s trial testimony, established a reasonable probability that Graham authored the messages. It is not dispositive that the messages at issue were sent from Becky's Facebook account. Even where a defendant sends an electronic communication from an account bearing his name, the trial court must conduct an inquiry into whether the communications were authored by the defendant. *Pavlovich v. State*, 6 N.E.3d 969, 976 (Ind. Ct. App. 2014), *trans. denied*. In this case, the sender of the messages twice identified himself as "TJ," which was Graham's nickname. Tr. Vol. I, pp. 204–05; Ex. Vol., State's Ex. 1 at 5–6, 18. Throughout the exchange, Graham

repeatedly referred to Becky in the third person and referenced information about the sexual assault of L.G. that only he could have known, begging L.G. not to tell Becky about what had happened between them the night before. Graham repeatedly admitted that his actions were "wrong" and that he was "sorry" for what he did. *Id.* Lastly, Graham acknowledged he had a sexual encounter with L.G. that fell short of actual penetrative sexual intercourse when Graham said, "Did I f*ck you? No now drop it." Ex. Vol., State's Ex. 1 at 12. The Facebook messages paralleled L.G.'s trial testimony and were properly authenticated and admitted into evidence. *See Pavlovich,* 6 N.E.3d at 978–79.

## II. *Video of Graham in Jail Clothing*

[17] Graham further argues that the trial court violated his due process rights when it admitted into evidence a one-minute-and-eight second video clip of him in an orange jail jumpsuit during his post-arrest interview with Detective Lucas. Specifically, Graham argues that allowing the jury to view him disheveled and wearing jail clothing prejudiced him as there was no purpose for admitting the video.

[18] An individual accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on the grounds of suspicion, indictment, continued custody, or other circumstances not offered as proof at trial. *Taylor v. Kentucky,* 436 U.S. 478, 485 (1978). The Supreme Court of the United States has established that a trial court may not compel a defendant to appear at trial in jail clothes because doing so violates basic due process rights, impinges on the presumption of innocence, and could

impede the defendant from engaging meaningfully with his trial counsel. *Deck v. Missouri*, 544 U.S. 622, 634–635 (2005). Essentially, Graham contends that the presumption of innocence was impaired when the jurors viewed the short video in which he was wearing jail clothing and advised of his *Miranda* rights. We disagree.

[19] "In order for there to be a constitutional violation resulting from a defendant standing trial in jail attire, the defendant must show he was compelled to wear jail attire, and that it was readily identifiable as such." *Shackelford v. State,* 498 N.E.2d 382, 384 (Ind.1986) (citing *Estelle v. Williams,* 425 U.S. 501, 512 (1976)). In *Estelle,* the Supreme Court indicated a juror's judgment may be affected by the constant reminder of the accused's condition implicit in his appearance at trial in jail clothing. *Estelle,* 425 U.S. at 504–505. Such clothing is likely to be a continuing influence throughout the trial. *Id.* at 505.

[20] In *Ritchie*, the defendant argued that his trial counsel was ineffective for failing to object to video evidence showing him in jail clothing and shackled. *Ritchie v. State*, 875 N.E.2d 706, 718 (Ind. 2007). Specifically, Ritchie believed that the videos admitted in his case were constitutionally inadmissible because they (1) risked diluting the presumption of innocence; (2) risked the jury finding him guilty based on "extraneous influential factors" rather than evidence at trial; and (3) hindered his ability to participate with counsel. *Id.* Our supreme court disagreed and held that, "Any reasonable juror would have expected Ritchie to be dressed in jail clothing and shackled when meeting with members of the public outside the security of a jail cell." *Id.* at 718.

Here, much like in *Ritchie,* the video consumed only a minute portion of the two-day trial. The circumstances at hand are distinguishable from those in *Estelle* because the video was only a small portion of the trial as opposed to a defendant wearing a jail uniform during his entire trial. The bulk of the video contained footage of Detective Lucas administering Graham his *Miranda* rights and Graham asking Detective Lucas, "I don't understand how this turned into three [counts]." Tr. Vol. 1, pp. 188–89. In response, Detective Lucas said that Graham needed to speak to his lawyer and testified that he did not answer in further detail because "with [his] training and experience, [he] didn't feel like [he] was permitted to." *Id.* at 237.[1] Therefore, we conclude that the trial court did not abuse its discretion in permitting the jury to view the video.

### III. *Sufficiency of Evidence*

Graham further contends that the evidence is insufficient to support the jury's verdict. When reviewing a claim of insufficient evidence to sustain a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Jackson v. State*, 50 N.E.3d 767, 770 (Ind. 2016). It is the fact-finder's role, not ours, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* We will affirm the conviction unless no reasonable fact-finder could have found the elements of the crime

---

[1] The Indiana Constitution guards against the exploitation by the prosecutor of a defendant's invocation of the constitutional right to counsel. *Willsey v. State*, 698 N.E.2d 784, 793 (Ind. 1998). Here, Detective Lucas simply informed Graham that he needed to discuss it with his lawyer in response to the question that Graham asked. There was no showing in the video that Graham was invoking his right to counsel.

proven beyond a reasonable doubt. *Id.* It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Drane v. State,* 867 N.E.2d 144, 146–47 (Ind. 2007).

[23] To convict Graham of the two Level 4 felony counts of sexual misconduct with a minor, the State had to prove that Graham:

> a person of at least twenty-one (21) years of age, did perform or submit to other sexual conduct, as defined by I.C. 35-31.5-2-221.5, with L.G., a child at least fourteen (14) years of age but less than sixteen (16) years of age, to-wit: did insert his tongue into the child's vagina[.]
>
> and
>
> a person of at least twenty-one (21) years of age, did perform or submit to other sexual conduct, as defined by I.C. 35-31.5-2-221.5, with L.G., a child at least fourteen (14) years of age but less than sixteen (16) years of age, to-wit: did insert his finger into the child's vagina[.]

Appellant's App. Vol. 2, p. 91; *see* Ind. Code § 35-42-4-9(a)(1) (2014).[2]

[24] To convict Graham of Level 5 felony sexual misconduct with a minor, the State had to prove that Graham:

---

[2] We cite to, and the charging information includes, the language of the statute in effect at the time Graham committed these offenses.

a person of at least twenty-one (21) years of age, did perform or submit to fondling or touching with L.G., a child at least fourteen (14) years of age but less than sixteen (16) years of age, with the intent to arouse or satisfy the sexual desires of the child or defendant.

Appellant's App. Vol. 2, p. 91; *see* Ind. Code § 35-42-4-9(b)(1) (2014).[3]

[25]     Graham argues that the only evidence offered in support of his conviction was L.G.'s incredibly dubious testimony and there was no corroborating evidence. We disagree.

[26]     This court may reverse a defendant's conviction when presented with incredibly dubious testimony that "runs counter to human experience" such that a reasonable person could not believe it. *Edwards v. State*, 753 N.E.2d 618, 622 (Ind. 2001); *see also C.S. v. State*, 71 N.E.3d 848, 851 (Ind. Ct. App. 2017). However, in order to invoke the incredible dubiosity rule, the defendant must establish that: (1) the judgment against him was based on the testimony of a single witness; (2) the testimony is inherently contradictory, equivocal, or the result of coercion; and (3) the testimony is completely unsupported by any circumstantial evidence. *Moore v. State*, 27 N.E.3d 749, 756 (Ind. 2015); *see also Tillman v. State*, 642 N.E.2d 221, 223 (Ind. 1994).

---

[3] We cite to, and the charging information includes, the language of the statute in effect at the time Graham committed this offense.

[27] Here, the incredible dubiosity rule is inapplicable. L.G.'s trial testimony identifying Graham as the person that molested her was supported by State's Exhibit 1. As explained above, the Facebook messages exchanged between Graham and L.G. made several allusions to the sexual assault. Graham repeatedly said he was sorry and admitted his actions were wrong. Graham admitted to being in the room with L.G., stating that he "almost fell" as he left the room. Ex. Vol., State's Ex. 1 at 17.

[28] Additionally, there were no internal inconsistencies with L.G.'s trial testimony. L.G. had been living with the Graham family for a week and was familiar with Graham's voice. L.G. identified Graham in the dark room by the sound of his voice, the smell of vodka from his breath, and his larger body size compared to Graham's sons who were sleeping in the room. On cross-examination by Graham, L.G. remained unequivocal and consistent.

[29] L.G. did not immediately tell her parents or the authorities about the sexual assault by Graham, a person who occupied a position of trust in her life. L.G. testified she was "embarrassed" and felt "awkward" about the situation. Tr. Vol. I, pp. 208–09. L.G. did not want to damage her mother's and Becky's friendship and was afraid she would "betray" Becky. *Id.* L.G.'s testimony does not run counter to human experience. For all of these reasons, we conclude that the jury's verdict was supported by sufficient evidence.

## IV. *Inappropriate Sentence*

[30] Lastly, Graham argues that his aggregate fifteen-year sentence is inappropriate in light of the nature of the offense and the character of the offender. Specifically, Graham argues that his sentence is inappropriate because he has stable employment, has been married to Becky for a number of years, and provides for Becky's children. Graham also claims there was no evidence in the record indicating L.G. suffered any psychological trauma as a result of the offense.

[31] Although a trial court may have acted within its lawful discretion in imposing a sentence, Article 7, Sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of sentences through Indiana Appellate Rule 7(B), which provides that a court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Reid v. State,* 876 N.E.2d 1114, 1116 (Ind. 2007) (citing *Anglemyer v. State,* 868 N.E.2d 482, 491 (Ind. 2007)). The defendant has the burden of persuading us that his sentence is inappropriate. *Id.* Finally, although we have the power to review and revise sentences, "[t]he principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State,* 895 N.E.2d 1219, 1225 (Ind. 2008).

[32] A Level 4 felony conviction carries a sentence between two and twelve years, with an advisory sentence of six years, and a Level 5 felony conviction carries a sentence between one and six years, with an advisory sentence of three years. *See* Ind. Code §§ 35-50-2-5.5 & 6. The advisory sentence is a helpful guidepost for ensuring fairness, proportionality, and transparency in sentencing. *Hamilton v. State,* 955 N.E.2d 723, 726 (Ind. 2011) (citing Ind. Code § 35-50-2-1.3 (2008), which defined "advisory sentence" as "a guideline sentence that the court may voluntarily consider as the midpoint between the maximum sentence and the minimum sentence").

[33] In this case, Graham was ordered to serve concurrent nine-year sentences for each Level 4 felony conviction, and a concurrent four-year sentence for the Level 5 felony conviction. *See* Ind. Code §§ 35-50-2-5.5 & 6. Graham pled guilty to the habitual offender count, which enhanced Graham's sentence by six years, for an aggregate sentence totaling fifteen years executed at the Department of Correction. The sentencing order reflected a recommendation that the sentence be purposeful incarceration.

[34] Crimes against children are particularly contemptible. *See Singer v. State,* 674 N.E.2d 11, 15 (Ind. Ct. App. 1996). Concerning the nature of the offense, Graham forced L.G. to touch his erect penis, repeatedly inserted his finger into her vagina, and performed oral sex on L.G. The sexual assault lasted for approximately thirty minutes, causing L.G. to feel "gross and awkward." Tr. Vol. I, pp. 202–03. Graham committed this offense at a time that L.G. was in a particularly vulnerable mental state. L.G. was grieving the loss of her boyfriend,

who had committed suicide recently. Graham had knowledge that L.G. was mentally vulnerable and was apologetic for taking advantage of her when she had trusted him. L.G. told Graham she would "never [feel] safe around [Graham] again." Ex. Vol., State's Ex. 1 at 9. Further, Graham urged L.G. to stay quiet about the incident, putting significant psychological pressure on L.G. *Id.* 9–12. The record is clear that L.G. suffered harm as a result of Graham's actions.

[35] Concerning the character of the offender, Graham has been convicted of four felonies and ten misdemeanors for numerous offenses. In 2003, Graham committed residential entry as a felony. Then in 2004, Graham committed burglary, and in 2006, Graham committed another burglary and auto theft. Graham's criminal behavior has been linked to his abuse of substances, and Graham has not made efforts to stop that abuse. In the instant offense, Graham was under the influence of alcohol when he sexually assaulted L.G. At trial, L.G. testified that Graham smelled of vodka, and Graham himself in the Facebook messages admitted he was drunk and remembered only "a little" about the actual incident. Ex. Vol., State's Ex. 1 at 17. Such an abuse of alcohol reflects poorly on Graham's character. Graham preyed on a vulnerable girl who had taken comfort in his home after she had just experienced a traumatic event. Graham attempted to cover up his actions by pressuring L.G. not to reveal what he had done and took advantage of L.G.'s vulnerable mental state. Graham has not met his substantial burden of persuading us that his sentence is

inappropriate in light of the nature of the offense and the character of the offender.

## Conclusion

[36] The trial court properly admitted the Facebook messages between Graham and L.G. and the video clip showing Graham in jail clothing. Also, the evidence presented to the jury was sufficient to sustain Graham's conviction, and L.G.'s trial testimony was not incredibly dubious. Finally, Graham's aggregate fifteen-year sentence is not inappropriate in light of the nature of his offense and his character. Accordingly, we affirm Graham's convictions for sexual misconduct with a minor and the sentences imposed.

May, J., and Brown, J., concur.